Abraham N. Geller, J.
In this action for injunctive relief the court granted defendants’ motion made at the opening of trial to try the counterclaim first. Analysis of the causes of action and prayer for relief in the complaint indicated that a determination sustaining the counterclaim for specific performance of a certain memorandum of understanding between the parties might be dispositive of the entire case (see Civ. Prac. Act, § 443, subd. 3).
Nobilium Processing and Products Co., Inc. (hereinafter Nobilium) was organized in 1947 by defendant Arnow. It operated a dental laboratory in this city and also sold products under the trade name Nobilium to dentists and other dental laboratories, having received from the owner of the patent for this metal alloy a license for its exclusive use in this territory. In 1958, 1959 and 1960 respectively, Arnow sold some of his shareholdings to the three plaintiffs, all with experience in the dental laboratory business, and these four were then equal stockholders in Nobilium. They also formed a partnership which conducted at the same premises a mail-order business supplying dentures to dentists and other laboratories.
Grievances on the part of the three plaintiffs and their desire to disassociate themselves from Arnow resulted after long, drawn-out conferences in a signed ‘ ‘ Memorandum Of Understanding ” on April 3, 1961. This provided that Arnow was to receive the sum of $2,500 and the name, license and corporate structure of Nobilium, with the right to open an office in the same building but not on the same floor; while the three plaintiffs were to receive all the furniture, fixtures and machinery in the laboratory and the accounts receivable of Nobilium as well as an assignment of the lease. The three plaintiffs agreed to pay all the outstanding obligations, including new notes for the amounts payable to Arnow under their original purchase agreements, and to execute a chattel mortgage and an assignment of the accounts receivable to him as security.
Although various acts were thereafter done by both sides in performance of that understanding — and, actually, the three *501 plaintiffs were given and still have sole control and use of the laboratory in their own business, with Arnow separately operating as Nobilium in the same building — the three plaintiffs subsequently refused to pay the $2,500 to Arnow and to execute the effectuating instruments described in the memorandum of understanding. Having by then consulted counsel, they raised the objection that the memorandum of April 3, 1961 was merely an agreement to agree and, therefore, not binding; and that their assent had been induced by alleged misrepresentations as to the applicable law by defendant Choper, the attorney who participated in the conferences and prepared the handwritten memorandum. Though known to be Arnow’s friend and attorney, as well as the attorney for the corporation, he was asked to help them compose their differences with Arnow and they did not at that time consult their own attorneys, as suggested by him. He is made a defendant herein as escrowee of the shares of stock and promissory notes arising from plaintiffs’ purchase agreements and also by reason of his alleged misrepresentations of law in conspiring with defendant Arnow.
Plaintiffs’ complaint contains six causes of action. The relief asked with respect to the first, third and fifth causes is an injunction against Arnow’s maintaining a competing business. The first is based upon his alleged violation of the stockholders ’ agreements with the plaintiffs; the third upon his alleged conspiracy and misrepresentation with defendant Choper in inducing plaintiffs to enter into the memorandum of understanding; and the fifth upon an alleged original misrepresentation as to the solvency of Nobilium inducing plaintiffs to purchase their shares from Arnow. In the second plaintiffs seek to enjoin the transfer of their shares held in escrow and the negotiation of their promissory notes. In the fourth plaintiffs request the return of the seal and corporate books and records of Nobilium. In the sixth they ask that the post office be ££ directed” to deliver the mail to Nobilium as formerly and that the landlord similarly be £ ‘ directed ’ ’ to correct the bulletin listing.
Since every act which plaintiffs seek to restrain in their complaint for a permanent injunction is referable to the new agreement, there can be no recovery if that agreement is upheld (Beatty v. Guggenheim Exploration Co., 225 N. Y. 380, 387; Higgins v. General Elec. Co., 258 App. Div. 606, 608). In effect, they are attempting by this action to enjoin Arnow from receiving any of the benefits of the April 3, 1961 understanding, while making no offer to give up the benefits obtained by them as the result of that transaction. They have not sued in rescission *502 of that agreement. Their complaint is directed solely to preventing Arnow from receiving and doing the very things agreed to therein. It seems clear that, if that understanding is held to be valid and enforcible, as requested in defendant Arnow’s counterclaim, he may not be so enjoined and the complaint must be dismissed without the necessity of trying its six causes of action. Accordingly, the court deemed it appropriate to try the counterclaim first, noting that pertinent background material might be presented by either side.
The grievances of the plaintiffs came to a head in March, 1961. An independent firm of accountants was retained, with Arnow’s consent, to review the financial statements for the previous three years prepared by Nobilium’s regular accountant. Although finding that these statements agreed with the books of account, the report dated March 16, 1961 set forth the details as to the sum of approximately $2,000 being owed to Nobilium by Arnow and one of the plaintiffs by virtue of a provision in the stock purchase agreement, and as to Arnow’s having received excess salary of $700. The report also stated that the accountants had been “informed” that Mr. Choper had received in 1959 a fee of $350 for legal services, which Arnow caused to be charged to Nobilium, and that Arnow had recently disposed of a 1955 automobile listed as a corporate asset without accounting for the proceeds.
The four stockholders discussed the situation on March 23 and agreed that Choper be asked, as attorney for the corporation, to sit in with them at a further conference. He came in on March 30 from Syracuse, where he was employed.
When Choper was informed on March 30 that the parties wished to “ split up,” he suggested that each get his own attorney but all four asked him to act for all of them. He then pointed to the formula for purchase of shares and the arbitration clause in the stockholders’ agreement, but none of them wanted that. The discussion which ensued was basically about plaintiffs’ grievances, particularly with references to Arnow’s not doing his job and to the items in the accountants’ report of March 16, and concerning various propositions for buying out. The plaintiffs stated that business was very good, that they did not need the name of Nobilium and that Arnow was a burden. Arnow wanted the name and license of Nobilium. Plaintiffs wanted the laboratory and the accounts receivable as a going concern. The conference ended with a proposal along these lines, plaintiffs to pay Arnow $2,500 and, in consideration of taking all the assets of Nobilium, to assume all *503 its obligations. It was agreed to work ont all the details on April 3.
After more than six hours of discussion of grievances and terms during the evening and night of April 3, all of the parties signed a handwritten “ Memorandum Of Understanding ” prepared by Choper from notes taken during the proceedings, each page, as well as an addendum, being initialed by them. Each of the three plaintiffs concededly read the “ memorandum ” and discussed among themselves and with Choper various provisions before signing and initialing it, and there was a further long discussion thereafter before the addendum involving a disputed point was written and initialed.
It is apparent that the three plaintiffs were motivated by their desire to obtain control of a working and fully-equipped laboratory and a going business and, at the same time, to be rid of Arnow. They had no need for Nobilium and did not fear it as a competitor in the hands of Arnow, since they expressly agreed that he was to receive the corporation as such, including its name and license, and that they had no objection to “ Arnow and/or Corporation ” remaining in the same building but not on the same floor. Although they maintained that the liabilities exceeded the assets, it is evident that they valued the assets much higher as a going concern under their control and made the offer to pay Arnow $2,500 because they believed that “ among the three of us, we could possibly pull the business out; there was a potential there.” Moreover, they were not interested in retaining the corporate structure of Nobilium. They had not as yet decided whether to form a corporation or a partnership for their new laboratory business. Three days later they executed and filed a partnership certificate.
It is also apparent that Arnow was interested in continuing the business of Nobilium which he had organized in 1947, and in consideration of plaintiffs releasing the corporation to him, he was willing to accept $2,500 for his interest in the business being taken over by plaintiffs, although a one-quarter interest had been valued at $10,125 in plaintiffs’ purchase agreements.
It was agreed that the three plaintiffs were to resign as officers and directors of Nobilium and indorse to Arnow their stock certificates then being held in escrow. Arnow was to be eliminated as a member of the mail-order partnership and to cease his work with and on behalf of the three plaintiffs immediately. The three plaintiffs were to receive all the assets, including an assignment of the lease and the telephone number of the business. They agreed to pay all obligations, including the balances due Arnow on their stock purchases and a bank *504 loan to the corporation secured by Arnow’s collateral, which he agreed was to remain at the bank’s discretion. As security to him in case of default they agreed to execute a chattel mortgage on all the equipment and an assignment of the accounts receivable which they were collecting. They agreed to save him and the corporation harmless but only as to claims “ reflected in the corporate books.” The payment to Arnow of the $2,500 was to be made on April 14, 1961. It was provided that “ this agreement, as fully set forth in formal agreements, is to take effect on 4/15/61.” Choper testified that this time interval had been arranged for his convenience — to permit him time to obtain a list of the inventory needed for the chattel mortgage, return to his position at Syracuse, draw up all the effectuating instruments and on a return trip to New York have these formal documents executed.
The plaintiffs now claim that they did not fully understand this Memorandum Of Understanding. However, the language employed is clear and direct, with the slightest of references, and only where necessary, to a simple form of legal verbiage. It is manifestly a correct transcription of the oral understanding reached down to the minutest details, such as arrangements for purchase at cost of imprinted stationery and labels and increase at plaintiffs’ request of the 10-day grace period to 20 days.
The three plaintiffs are all men of some education and considerable experience, particularly in the dental laboratory business. They had operated their own businesses for many years and obviously were familiar with the terms used in this instrument, and also must have known the value, from a business standpoint, of what they were acquiring with relation to what they were assuming and agreeing to pay. It would be unrealistic to give credence to their present contention that the Memorandum Of Understanding contained provisions contrary to what had been orally agreed to that evening. Their own testimony reveals a point-by-point discussion of the memorandum before signing it. It is impossible to believe that all three of them could be so deceived.
They also claim that it was not intended to be binding. But when questioned as to this, they testified that Choper told them to sign “ to show good faith * * *. If we didn’t sign it, it would mean wo might change our minds ”, that Choper had also said that unless they signed, “how could he go back to Syracuse and have his girl type everything up and then come back, and we had decided other things.” It is clear that they fully understood that they were signing a binding agreement.
*505 Actually, the parties gave the memorandum a practical construction, which leaves no doubt as to their understanding that it was a complete and binding agreement and that the provision relative to its taking effect on April 15, 1961 was intended solely to refer to the execution and delivery of the formal effectuating documents.
On April 6, when Choper went to the laboratory to get the information for the inventory schedule, the following acts took place. Arnow, who had ceased working for the business, was moving his things to his new leased office in the building. The three plaintiffs asked Choper to draw up the business certificate for their new partnership under the name of Advanced Dental Laboratories and for the continuation of the mail-order partnership by them. Both certificates were executed that day (and filed on April 7 by plaintiffs’ bookkeeper). Papers were also drawn up in the name of Nobilium and signed by Arnow transferring the lease to Advance. Thus, the plaintiffs went into possession and control on April 6, 1961 of all the assets of the laboratory and mail-order business — and in partnership form. They told Choper at that time that they had acquired five new customers and were very pleased with the new setup, as Nobilium and Arnow were not liked in the market.
By April 14, however, plaintiffs had consulted with counsel, and when Choper arrived with the closing papers counsel informed him that no papers would be executed or payment made, that plaintiffs had been induced, through his misrepresentations, into signing the memorandum and that, in any event, it was merely an agreement to agree. These contentions form the basis of plaintiffs’ affirmative defenses to defendant Arnow’s counterclaim for specific performance of the April 3 Memorandum Of Understanding.
It is clear that a provision in an agreement for future formalization or execution of effectuating documents does not necessarily render it an agreement to agree (Sanders v. Pottlitzer Bros. Fruit Co., 144 N. Y. 209; 1240 Third Ave. v. Birns, 232 App. Div. 522; Brassteel Mfg. Co. v. Mitsubishi Corp., 21 Misc 2d 343). The question is whether the agreement alone or in combination with the other evidence indicates that the parties contemplated no further negotiations or agreement upon any essential terms; if so, the agreement is binding upon the parties and enforcible. Here, the evidence is overwhelming on the basis of the terms in the instrument itself, the testimony of all the witnesses in the case concerning the discussions preceding and accompanying its execution, and — most significantly — the acts of performance of its most important provisions for plain *506 tiffs’ benefit three days later, that all the parties understood and acted on the assumption that it was immediately binding and effective, with only formal closing matters to be completed by April 15.
The evidence also indicates that the plaintiffs were not induced by misrepresentations to sign the Memorandum Of Understanding. They had before them the up-to-date report of the independent firm of accountants. They discussed in detail and at great length their grievances against Arnow, the matter of the assets and liabilities, the various propositions for buying out, and the step-by-step procedure to accomplish the disassociation. The three plaintiffs knew what they wanted — a working-laboratory and a going business — and got exactly what they bargained for. There was nothing- wrongful in their agreeing to assume all the obligations, since they were taking all of the assets out of Nobilium — both of which were fully known to them. As men of experience in this field they were capable of assessing the business value to them of the entire transaction, and their own testimony reveals that, despite their present disclaimer, they agreed after a complete, open and frank discussion of all phases of the problem.
It is unfortunate that they did not follow Choper’s suggestion that they be represented by their own attorneys, but the mere fact that he acted for all, when known to be a friend and personal attorney of Arnow as well as of the corporation, does not render the agreement openly arrived at subject to a charge of misrepresentation and conspiracy in the absence of overreaching or unfair dealing on his part. There is no reason for imputing anything sinister in his providing that, although plaintiffs were buying Arnow’s interest for $2,500, they were to indorse and transfer their Nobilium shares to him. He was to receive the ‘ ‘ corporation ’ ’ and thereby obtain the use of the license and name conferred by prior agreement with the holder of the patent therefor. Plaintiffs actually were paying for Arnow’s release of all his interest in the assets being taken over by them.
As previously noted, plaintiffs have at no time requested rescission of the Memorandum Of Understanding. That was the remedy available to them when they claim to have learned from counsel on or about April 14, 1961 of the alleged wrong done to them. They continued instead to accept the benefits of the understanding. The basic proposition is clear. “As matter of law, right to rescind must be exercised promptly after the injured party learns of the wrong. Acceptance of benefit under the contract with knowledge of the wrong constitutes a waiver of the wrong” (New York Tel. Co. v. Jamestown Tel. Corp., *507 282 N. Y. 365, 372). Plaintiffs are not even now offering to rescind.
Having obtained the benefits of the transaction, which their complaint indicates they wish to retain, they now seek to deprive Arnow of the consideration he was to receive thereunder. The contentions raised by their counsel on April 14 and in this case must be viewed as unfounded afterthoughts to support their attempt to gain exclusive ownership and control of the business, deprive Arnow of the right to operate as Nobilium and avoid the payment of obligations due to him.
Before concluding, the court has taken note of plaintiffs’ argument in their brief with respect to the failure of Arnow to testify. The court did suggest that he would like to hear Arnow, but, when defendants’ attorney stated that he believed he had established his case without him, and plaintiffs’ attorney indicated that he did not wish to interrogate him, he was withdrawn. As herein indicated, the court has found on a review of the record that the counterclaim was established on the basis of the entire evidence in the case, oral and documentary.
Judgment on the counterclaim is accordingly granted on the merits in favor of defendants. Since such determination disposes of the issues raised in plaintiffs’ complaint, it is dismissed.