**INTERNATIONAL TELEMETER CORPORATION,**
Plaintiff-Appellee,

v.

**TELEPROMPTER CORPORATION,**
Defendant-Appellant.

**No. 52, Docket 78–7111.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 16, 1978.
Decided Jan. 15, 1979.

Laurence Greenwald, New York City (Stroock & Stroock & Lavan, Eva L. Coben, Curtis C. Mechling, New York City, on brief), for plaintiff-appellee.

Michael Lesch, New York City (Shea, Gould, Climenko & Casey, Arthur D. Felsenfeld, New York City, on brief), for defendant-appellant.

Before LUMBARD, FRIENDLY and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

In this case, originally brought as a suit for patent infringement, defendant Teleprompter Corporation appeals from a judgment of the district court, Motley, J., filed on February 21, 1978 after a bench trial and amended March 7, 1978, insofar as it (1) directs Teleprompter to pay plaintiff International Telemeter Corporation (ITC) $245,-000 plus interest and costs for Teleprompter's breach of an agreement settling patent litigation, and (2) dismisses without prejudice Telepromter's counterclaim for a declaration of the patent's invalidity.[1]

The parties agree that New York law governs the enforceability of the settlement agreement, which was negotiated, consummated, and to be performed in New York, and which was explicitly made subject to New York law. The issues are (1) whether there was a binding settlement agreement enforceable against Teleprompter, and (2) whether enforcement of the settlement agreement violates the public policy enunciated in *Lear v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). As Teleprompter has not persuaded us that the district court erred in finding that the parties had consummated a binding settlement agreement or that this agreement violates the policy of *Lear, supra,* we affirm.

I

The relevant facts are undisputed. The present action arises from a suit for patent infringement commenced by ITC on March 15, 1968 against several defendants in the District Court for the Western District of Washington. On September 1, 1970, Tele-

---

1. The patent at issue is a patent for the design and manufacture of converters used in the transmission of cable television programs.

prompter intervened as a defendant and counterclaimant in the action, seeking, *inter alia,* declarations of patent invalidity and noninfringement. Following the dismissal of several claims and counterclaims, by 1973 the only parties remaining in the litigation were ITC, Teleprompter, and Philip D. Hamlin and Hamlin International Corporation (collectively, the "Hamlin defendants").

In February, 1973, William Bresnan, then President of Teleprompter, wrote to Arthur Groman, a Los Angeles attorney, asking if ITC wished to "discuss . . . a [negotiated] resolution of the patent litigation." On February 9, 1973, Groman responded by sending to Bresnan a draft license agreement proposed by ITC as a basis for settling the litigation. The draft agreement provided for minimum royalties of $75,000 for the first three years and damages for past infringement totalling $240,000. Bresnan turned down the proposed agreement but suggested that a meeting be arranged to discuss possible settlement.

The requested settlement meeting took place in New York City in April, 1973. Present on behalf of Teleprompter were William K. Kerr, Jules P. Kirsch, and Bresnan himself. Present on behalf of ITC were Morton Amster, Thomas Harrison, and Kenneth Merklen. All but Bresnan were acting as lawyers. The first meeting proved inconclusive.

In early July, 1973, after a further settlement proposal of Bresnan made on May 30 was found unacceptable by ITC, the parties met a second time. According to Amster, at this meeting the parties "negotiated the terms of the settlement." The parties assigned to Amster the task of preparing the initial drafts of the agreement, which included the following terms: an aggregate payment by Teleprompter of $245,000 in settlement of all claims against Teleprompter and the Hamlin defendants, the licensing of Teleprompter and the Hamlin defendants under the disputed patent, the dismissal of the pending litigation, and the issuance of a press release. These basic terms were never altered during the subsequent negotiations.

On July 26, 1973, Amster sent Kerr a copy of the draft agreements together with a proposed schedule for payments totalling $245,000.

There followed a series of minor revisions and exchanges of revised drafts. Amster, as attorney for ITC, and Kirsch, as attorney for Teleprompter, agreed to final changes at a meeting held on August 28 or September 7, 1973. Thereafter, on September 10, 1973, "clean drafts" were forwarded by Amster to Kirsch. On September 26, 1973, Amster sent to Kirsch copies of the Teleprompter and Hamlin license agreements and copies of the stipulation and order of dismissal to be filed in the patent lawsuit pending in the Western District of Washington. In his covering letter, Amster remarked, "Hopefully we have attended to all the minor changes and the documents are in condition for execution. . . . Perhaps upon a review of the papers, you would be willing to advise your local counsel [in the Washington litigation] that the case is settled so that he and [ITC's local counsel] can advise Judge Boldt that the case is settled and that a proposed stipulation and order will be filed shortly."

On October 3, 1973, Kirsch did so advise Teleprompter's Seattle counsel, Richard Williams. That same day, Williams wrote to Judge Boldt that "the final Settlement Agreement has been transmitted to all parties for the purpose of signature . . . we should be in a position to present a Stipulation and Order of Stipulation to the Court for its consideration and entry." Williams further advised the court that the pending trial date "may be vacated." A copy of this letter was sent to Amster. If Williams overstated the parties' proximity to settlement, as Kirsch later claimed at trial, Kirsch failed to correct the allegedly mistaken impression conveyed to the trial court.

Just as the parties were finishing their work on the settlement documents, a dispute arose between Teleprompter and the Hamlin defendants over the Hamlin defendants' obligation to pay amounts claimed by Teleprompter pursuant to its interven-

tion agreement with the Hamlin defendants. Rather than allow the settlement agreement to founder on this last minute disagreement between the defendants, Kirsch acted to secure a separate peace between Teleprompter and ITC. On October 25 and October 26, 1973, he telephoned and wrote to Amster to advise him of the falling out between Teleprompter and the Hamlin defendants and attempted to secure a settlement as to ITC and Teleprompter on precisely the same terms as those already agreed upon. In his October 26 letter, Kirsch wrote as follows to Amster:

Dear Mort:

As I advised you in our telephone discussions on Thursday and Friday, October 25 and 26, 1973, Mr. Hamlin is unwilling to pay Teleprompter the amounts due Teleprompter pursuant to the August 3, 1970 Intervention Agreement. As a consequence, *Teleprompter now wishes to settle the litigation only with respect to Teleprompter on the terms which had been agreed upon with respect to Teleprompter in the Settlement Agreement and the License Agreement which accompanied your September 26, 1973 letter, and I understand that this is agreeable with ITC. . . .*

*In our telephone conversation on October 26, 1973, you and I agreed that I would revise the Settlement Agreement to limit its terms to Teleprompter only, that Teleprompter will make the payments specified in Schedule 1 to the original Settlement Agreement, that Teleprompter will execute the original ITC-Teleprompter License Agreement, and that I would revise the Stipulation and Order of Dismissal to limit dismissal of the action to Teleprompter only. . . .*

Sincerely,

Jules P. Kirsch

(Emphasis added.)

Thus Kirsch's letter committed Teleprompter to a settlement on the terms "which had been agreed upon" and which were already set forth in the draft settlement papers accompanying Amster's September 26, 1973 letter. At trial, Kirsch confirmed that he had Teleprompter's authorization to send this October 26, 1973 letter. In fact, Kirsch sent a copy of this letter to Teleprompter's general counsel, Barry Simon. If this letter inaccurately conveyed Teleprompter's intent to be bound, Simon made no effort to set the matter straight. All that remained to be done before a formal signed agreement could be executed was to eliminate mechanically all reference to the Hamlin defendants in the draft agreement.

Several important events occurred on October 29, 1973. Kirsch duly revised the settlement papers to delete all references to the Hamlin defendants and forwarded the revised documents to Amster on the morning of October 29. These were listed as follows:

1. A revised settlement agreement.

2. An unrevised Schedule 1 to the revised settlement agreement.

3. A revised stipulation and order of dismissal as to Teleprompter only.

4. An unrevised ITC–Teleprompter license agreement.

5. A revised joint announcement of settlement and dismissal of the litigation as to Teleprompter only.

Kirsch also sent a separate letter to Amster asking him to call as soon as he had finished reviewing the settlement papers "so that if there are any changes you wish to have made, we can discuss them. If necessary I can arrange for them to be made before I leave for Los Angeles this afternoon. In that way the final papers can be delivered promptly to Teleprompter for execution and returned to you." No changes were suggested by Amster. All that remained was to obtain the requisite signatures and make delivery. Consequently, that afternoon Kirsch wrote another letter to Amster, enclosing three copies of the stipulation and order of dismissal as to Teleprompter which Kirsch had signed and dated October 29, 1973. Amster also signed the stipulation and order of dismissal that afternoon, as requested by Kirsch. Kirsch also requested that Amster send a ribbon copy of the stipulation and order to ITC's Seattle, Wash-

ington counsel and return a signed electrostatic copy to Kirsch. Kirsch advised Amster that he had called Williams, Teleprompter's Seattle counsel, and that Williams would sign the stipulation upon receiving it from ITC's Seattle counsel and would then file it with the court.

That afternoon, October 29, Kirsch sent to Peter A. Gross, the assistant general counsel of Teleprompter, copies of the settlement agreement. Gross was to have these documents executed by Teleprompter and returned to Amster together with a certified check in the amount of $26,250.00 pursuant to Schedule 1 of the settlement agreement. Kirsch advised Gross that Amster would then arrange to have the signed agreements and the check delivered to ITC; duplicate signed copies of the settlement and license agreements would then be returned to Gross. Finally, Kirsch advised Gross that he was arranging to have the stipulation and order of dismissal filed in court by Teleprompter's Seattle counsel.

The following day, October 30, 1973, Teleprompter's president, Bresnan, signed the settlement agreement. Although plaintiff had demanded production of this document before trial, its existence came to light for the first time at trial during the testimony of Bresnan, after Judge Motley had overruled objections to questions concerning communications between Bresnan and Teleprompter's counsel. When the settlement agreement was first brought to him by Gross, Bresnan refused to sign without the approval of Jack Kent Cooke, Chairman of the Board and Chief Executive Officer of Teleprompter. At Gross' insistence, however, Bresnan signed the document "subject to the proviso that it would not be delivered until it had been reviewed with Mr. Cooke and also with Mr. Greene [Teleprompter's treasurer]."

That same day, October 30, Kirsch arrived in California as planned. That afternoon, he received a telephone message at his hotel, which read as follows: "Mr. Gross called. The settlement is O.K. Papers and check will go out tomorrow."

In what was apparently yet another reference to Bresnan's signing of the final agreement, on October 31, 1973, Kirsch wrote to Hamlin, advising him that "Teleprompter has decided to settle with ITC . . . a revised Settlement Agreement as between ITC and Teleprompter only and a revised Stipulation of Dismissal of the Action as to Teleprompter only have been executed." Based on communications with Teleprompter, Kirsch believed these representations to be duly authorized and accurate when made. Indeed, Kirsch sent copies of this letter to Simon and to Gross, Teleprompter's in-house counsel, and to Amster and Harrison, ITC's counsel. If this letter inaccurately conveyed the impression that a settlement had been consummated, Teleprompter did not move to correct that impression.

Thereafter, new management at Teleprompter refused to proceed with the settlement agreement. Accordingly, on November 16, 1973, Kirsch called Amster to tell him that he had been mistaken in his earlier belief that Teleprompter had agreed to the settlement with ITC and had in fact executed the settlement. Kirsch confirmed the telephone conversation in a letter of the same date which reads as follows:

Dear Mort:

This letter will confirm that in my telephone conversation with you this afternoon I advised you that since I wrote a letter to Mr. Hamlin dated October 31, 1973, a copy of which was sent to you, in which I stated that the revised Settlement Agreement had been executed, I have learned that in fact the revised Settlement Agreement was not executed.
. . .

Sincerely,
Jules P. Kirsch

Kirsch's statement in this letter that the settlement agreement had never been executed conflicted not only with his prior statements, but also with Bresnan's later admission at trial that he had in fact signed the agreement. In any event, after sending this letter, Kirsch withdrew as Teleprompter's counsel in this dispute.

On November 28, 1973, Amster wrote to Kirsch stating that he had received Kirsch's November 16 letter but had nevertheless advised ITC that it had a legally enforceable agreement with Teleprompter.

On December 21, 1973, ITC's Seattle counsel, Williams, advised Judge Boldt that the settlement agreement had not been returned to ITC by Teleprompter and that Teleprompter's local counsel had refused to sign the stipulation and order of dismissal. On January 7, 1974, Teleprompter's Seattle counsel advised Judge Boldt that Teleprompter's new management had changed its mind and had decided not to settle.

On December 27, 1973, the district court in Seattle entered a consent decree between ITC and the Hamlin defendants enjoining the Hamlin defendants from further infringing ITC's patent. Thereafter, since both remaining parties, ITC and Teleprompter, were New York corporations, the action was transferred to the Southern District of New York for the convenience of the parties and witnesses pursuant to 28 U.S.C. § 1404(a), by order entered March 15, 1974.

By order dated October 3, 1974, the district court approved a stipulation between ITC and Teleprompter, granting ITC leave to file an amended and supplemental complaint containing additional counts seeking to enforce ITC's settlement agreement with Teleprompter.

## II

In the amended and supplemental complaint, ITC sought damages for patent infringement (count I) and, alternatively, enforcement of the settlement agreement (counts II and III). As to count I, Teleprompter in its amended answer raised the invalidity of the patent as a defense and counterclaimed for a declaration of the patent's invalidity. As to counts II and III, Teleprompter defended on the grounds (1) that the settlement agreement never came into effect, (2) that enforcement of the settlement agreement would contravene the public policy set forth in *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d

610 (1969), and (3) that ITC had suffered no damage because of any reliance on the settlement agreement.

On March 25, 1976, the district court ordered that the issues raised by count I were to be tried only in the event ITC did not prevail on either count II or III and that further pretrial proceedings as to count I and the trial thereof were therefore deferred until after the conclusion of the trial on the issues raised by counts II and III. If the parties were found to have entered into a binding agreement to settle (count II), this would terminate the litigation. If it were found that ITC entered into the settlement agreement with the Hamlin defendants to its detriment in reliance upon its settlement agreement with Teleprompter (count III) this too would end the litigation. Thus the case proceeded to trial in December, 1977 on counts II and III. The district court found that there was a binding settlement agreement, that this agreement did not violate the policy of *Lear, supra,* and that Teleprompter was therefore liable to ITC for $245,000.00 it had agreed to pay for past infringement.

## III

Teleprompter's first claim on appeal is that the district court erred in finding that the parties intended to be bound prior to the actual signing and delivery of the agreement. Teleprompter claims that the parties did not intend to be bound prior to formal delivery and that, since the agreement was never delivered, there was no enforceable contract.

With respect to the standard of review appropriate to passing upon a district court's finding of intent, Teleprompter asserts that the "clearly erroneous" standard is not applicable, but that if it is, the district court's conclusions as to intent are "clearly erroneous." Acceptance of appellant's invitation to exercise more intrusive review than would ordinarily be proper under the "clearly erroneous" standard, however, could not alter our conclusions here. The record amply supports the district

court's findings of fact and conclusions of law regardless of the standard of review.

The district court found that the parties had reached a final agreement as to the terms of the settlement and that both had manifested objective indications of their intent to be bound by October 29, 1973. Taken as a whole, the documents themselves suggest on their face an intent to be bound on both sides and a recognition of this intent to be bound. Viewed against the backdrop of the course of the negotiations and the testimony taken at trial, we find nothing in these documents that supports Teleprompter's claim that ITC had reason to know that Teleprompter contemplated that no legal obligation should arise until a formal contract was signed and delivered. Indeed, on several occasions, these documents, along with other communications by Teleprompter to ITC, conveyed the impression of a binding agreement, with physical signing and delivery no more than a formality.

As the district court found, the record strongly suggests that both parties would have signed prior to October 26, 1973 but for the disagreement between Teleprompter and the Hamlin defendants. The October 26 letter clearly indicates that all that remained to be done regarding the written agreement was to eliminate the now superfluous references to the Hamlin defendants. Kirsch's October 26 letter to Amster contains both an unequivocal expression of Teleprompter's intention to settle and a listing by incorporation of all the essential terms of the settlement. Although asked for his comments, Amster had none.

If there remained any doubt as to the nature of the parties' intent as of October 26, that doubt was dispelled by the events of October 29. On that day Kirsch sent to Amster for signing a complete set of settlement papers. All that remained was to have Bresnan sign the settlement agreement, to have local counsel in Seattle sign the stipulation and order of dismissal, and to file the necessary papers in court. Particularly significant, in our view, was the signing and transmittal to opposing counsel of the stipulation and order of dismissal.

Teleprompter could have requested that the signed stipulation be held in escrow pending the signing and delivery of the other documents. It did not. Accordingly, Amster acted as any other reasonable person would have when he concluded that there was a binding agreement as of October 29, if not before. As the district court concluded, "these two lawyers would not have signed the stipulation unless they understood that both parties intended to be bound at that juncture and that all that remained to be done was the formalization of what had been agreed."

Subsequent communications by Teleprompter to ITC further support the district court's finding that the parties believed that a binding agreement had been consummated. On October 31, Kirsch stated in a letter to Amster that "Teleprompter had decided to settle with ITC as to Teleprompter only . . . a revised Settlement Agreement . . . and . . . Stipulation of Dismissal . . . have been executed." Teleprompter officials who authorized this communication received copies of this letter and did not disavow its contents.

Teleprompter argues that Kirsch had no authority to bind Teleprompter to a settlement. Kirsch, however, was acting within the ambit of his apparent authority and ITC was entitled to rely upon Kirsch's authority so long as there was no reason to believe that he was exceeding it. Teleprompter knew that ITC believed that Kirsch had the requisite authority and did nothing to correct this impression. In fact, ITC had no reason to think that Kirsch was exceeding his authority and Teleprompter had no reason to correct any misimpression because, as the district court found, Kirsch had full authority to negotiate and consummate a settlement. That a lawyer should have such authority is not rare. In this case, moreover, Kirsch kept Teleprompter apprised at all times of what he was doing. Teleprompter officials were sent copies of all the correspondence which the district court relied upon in finding a binding agreement. Teleprompter officials failed to

disavow Kirsch's actions even when Kirsch sent them copies of his October 31 letter announcing that the settlement was executed.

The district court's decision is consistent with New York case law dealing with similar situations. See, e. g., *V'Soske v. Barwick,* 404 F.2d 495 (2d Cir. 1968) (agreement enforced against defendant for sale of multimillion dollar business despite failure to agree on several significant terms); *Zirman v. Beck,* 34 Misc.2d 597, 225 N.Y.S.2d 330 (1962) (informal "binder agreement" enforced without execution of contemplated formal agreement); *Karson v. Arnow,* 32 Misc.2d 499, 224 N.Y.S.2d 891 (1962) (agreement enforced although signing and delivery of formal contract had not yet occurred); *Park Inn Hotel Inc. v. Messing,* 31 Misc.2d 961, 224 N.Y.S.2d 179 (1962) (agreement enforced although signing and delivery of formal contract had not yet occurred); *Smith v. Onyx Oil and Chemical Co.,* 218 F.2d 104 (3d Cir. 1955) (New York law) (contract binding prior to signing because parties did not "pretty clearly show that such signing is a condition precedent to legal obligation"); *Viacom International Inc. v. Tandem Productions, Inc.,* 368 F.Supp. 1264, *aff'd,* 526 F.2d 593 (2d Cir. 1973) (agreement enforced despite lack of delivery); *Bruce Realty Company of Florida v. Berger,* 327 F.Supp. 507 (S.D.N.Y. 1971) (agreement enforced on basis of letters exchanged between counsel). See generally Restatement (Second) of Contracts § 26 (Tent. Draft # 1–7 1962) ("Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifested an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations").

■ The cases relied upon by the appellant are distinguishable on their facts from the case at bar. In *Scheck v. Francis,* 26 N.Y.2d 466, 311 N.Y.S. 841, 260 N.E.2d 493 (1970) the Court of Appeals found that the parties did not intend to be bound before signing and delivery, and further, that there was no proof that the parties had ever reached an agreement on the terms of the disputed contract. Similarly, in *Schwartz v. Greenberg,* 304 N.Y. 250, 107 N.E.2d 65 (1952), the Court of Appeals held that the refusal to deliver a signed agreement defeated the contract because "the parties did not intend to be bound until a written agreement had been signed and delivered." Whether or not the parties have manifested an intent to be bound must depend in each case on all the circumstances. Here the district court specifically found an intent to be bound prior to signing and delivery of a written agreement.

The settlement agreement entered into by ITC and Teleprompter requires that Teleprompter pay ITC $245,000 in damages for patent infringement through March 31, 1973. The agreement also provides for Teleprompter to receive a royalty-free license for use of the patent from April 1, 1973 through March 31, 1978, and, beginning April 1, 1978, for Teleprompter to pay ITC a royalty of $2.00 for each converter purchased.

Appellant argues that enforcement of this settlement agreement contravenes the public policy against licensee estoppel announced in *Lear v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). In *Lear,* the Supreme Court overruled earlier licensee estoppel cases and held that a patent licensee may assert patent invalidity as a defense to a contract action for nonpayment of royalties. In this way the Court sought to reconcile the policy of the patent law, which requires that all ideas in general circulation be dedicated to the common good unless protected by a valid patent, with the competing policy of contract law forbidding a purchaser from repudiating his promises simply because he later becomes dissatisfied with the bargain he has struck.

■ Enforcement of the challenged settlement agreement violates neither the letter nor the spirit of *Lear.* First, enforcement of the settlement agreement does not estop Teleprompter from challenging the validity of ITC's patent when that claim is

properly raised. Indeed, Teleprompter has already commenced an action for a declaration of this patent's invalidity in the District Court of Colorado, *Teleprompter Corporation v. Athena Cablevision Corporation,* Civil Action No. 78–398, filed April 13, 1978. Second, enforcement of this settlement agreement requires that Teleprompter pay damages for past infringement and not royalties. Thus *Lear's* holding that a licensee can stop paying royalties when he challenges the validity of the underlying patent is not threatened. *Lear* has not been extended to cover the collection of damages for past infringement. *Ransburg Electro-Coating Corp. v. Spiller & Spiller, Inc.,* 489 F.2d 974 (7th Cir. 1973).

Teleprompter, however, contends that the payments denominated as damages for past infringement are in reality royalties and that requiring Teleprompter to make the payments called for in the settlement agreement therefore violates the spirit if not the letter of the public policy articulated in *Lear.* The district court found that the language of the settlement agreement was unambiguous in denominating these payments as liquidated damages rather than royalties and held that parol evidence was not admissible to vary the plain meaning of its terms. *Rodolitz v. Neptune Paper Products, Inc.,* 22 N.Y.2d 383, 292 N.Y.S.2d 878, 239 N.E.2d 628 (1968).

Even leaving aside the parol evidence ruling, there is more than enough evidence in the record to support the literal reading of the settlement agreement relied upon by the district court. ITC was originally seeking approximately $240,000 in damages for infringement up to 1973, and royalties thereafter for so long as Teleprompter used ITC's patent. To obtain a settlement, ITC had to give up something. In the offer which formed the basis for the final agreement challenged here, ITC gave up its demand for royalties through 1978, offering a free five-year license as an inducement to settle, while continuing to insist on $240,000 damages. Accordingly, we agree with the trial court that the $240,000 payment is liquidated damages for past infringement and not a royalty payment for future use. *Lear* does not apply and the settlement agreement is not unenforceable for reasons of public policy.

Judgment affirmed.

FRIENDLY, Circuit Judge, concurring:

The difficulty in deciding this case comes from the gap between the realities of the formation of complex business agreements and traditional contract formulation. The nature of the gap is well described in a passage in 2 Schlesinger (ed.), Formation of Contracts: A Study of the Common Core of Legal Systems 1584–86 (1968), reprinted in Farnsworth, Young and Jones, Cases and Materials on Contracts (2d ed. 1972) at 99–100, which is reproduced in the margin.[1] Under a view conforming to the realities of business life, there would be no contract in

---

1. "Especially when large deals are concluded among corporations and individuals of substance, the usual sequence of events is not that of offer and acceptance; on the contrary, the businessmen who originally conduct the negotiations, often will consciously refrain from ever making a binding offer, realizing as they do that a large deal tends to be complex and that its terms have to be formulated by lawyers before it can be permitted to become a legally enforceable transaction. Thus the original negotiators will merely attempt to ascertain whether they see eye to eye concerning those aspects of the deal which seem to be most important from a business point of view. Once they do, or think they do, the negotiation is then turned over to the lawyers, usually with instructions to produce a document which all participants will be willing to sign. . . .

When the lawyers take over, again there is no sequence of offer and acceptance, but rather a sequence of successive drafts. These drafts usually will not be regarded as offers, for the reason, among others, that the lawyers acting as draftsmen have no authority to make offers on behalf of their clients. After a number of drafts have been exchanged and discussed, the lawyers may finally come up with a draft which meets the approval of all of them, and of their clients. It is only then that the parties will proceed to the actual formation of the contract, and often this will be done by way of a formal 'closing' . . . or in any event by simultaneous execution or delivery in the course of a more or less ceremonial meeting, of the document or documents prepared by the lawyers."

such cases until the document is signed and delivered; until then either party would be free to bring up new points of form or substance, or even to withdraw altogether. However, I cannot conscientiously assert that the courts of New York or, to the extent they have not spoken, the Restatement of Contracts 2d § 26 and comment C (Tent. Drafts 1–7 Revised and Edited) have gone that far, nor can I find a fair basis for predicting that the New York Court of Appeals is yet prepared to do so.

On the other hand, it does seem to me that the New York cases cited by the majority can be read as holding, or at least as affording a fair basis for predicting a holding, that when the parties have manifested an intention that their relations should be embodied in an elaborate signed contract, clear and convincing proof is required to show that they meant to be bound before the contract is signed and delivered. Such a principle would accord with what I believe to be the intention of most such potential contractors; they view the signed written instrument that is in prospect as "the contract", not as a memorialization of an oral agreement previously reached. Also, from an instrumental standpoint, such a rule would save the courts from a certain amount of vexing litigation. The clear and convincing proof could consist in one party's allowing the other to begin performance, as in *Viacom International, Inc. v. Tandem Productions, Inc.,* 526 F.2d 593 (2d Cir. 1975) and *V'Soske v. Barwick,* 404 F.2d 495 (2 Cir. 1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), or in unequivocal statements by the principals or authorized agents that a complete agreement had been reached and the writing was considered to be of merely evidentiary significance.

The facts forcefully marshalled by Judge Lumbard make a strong case for finding that the latter condition has been satisfied here. What weighs especially with me is Kirsch's letter of October 26, not claimed to have been unauthorized, saying that "Teleprompter now wishes to settle the litigation only with respect to Teleprompter on the terms which had been agreed upon with respect to Teleprompter" in the earlier three-party settlement "and I understand that this is agreeable with ITC". From then on the job of transforming the three-party agreement into a two-party one was largely scrivener's work and Teleprompter manifested no dissatisfaction with Kirsch's performance of this. Upon the understanding that our decision rests on the unique facts here presented and that we are not entering a brave new world where lawyers can commit their clients simply by communicating boldly with each other, I concur in the judgment of affirmance.