765 F.2d 144
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
JOSEPH D. BURKE, PLAINTIFF-APPELLANT,
v.
MARION D. CAMPBELL; JACK LESLEY; D.L. BAKER; KENTUCKY STATE
POLICE; LT. DON WOODALL, DEFENDANTS-APPELLEES.
 NO. 84-5527
 United States Court of Appeals, Sixth Circuit.
 5/16/85
 
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY
 Before: MERRITT, CONTIE and WELLFORD, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff Joseph D. Burke, a coal truck driver, appeals from a magistrate's recommendation, affirmed by the district court, that a settlement agreement should be enforced in his action under 42 U.S.C. Sec. 1983 against the Kentucky state police and certain officers in their official capacities.
 
 
 2
 Burke alleged that named defendant state officers violated his fourth and fourteenth amendment rights in arresting and jailing him briefly on several occasions after his refusals to allow a weighing of his truck by a particular method, insisted upon by defendants, using portable scales. He alleged that the officers were pursuing a state-established policy of disparate treatment against truckers who refused this requested weighing method, which he asserts is inaccurate and unfair. Burke complained that taking him into custody was unnecessary because the officers had no good reason to believe that he would not duly respond to a court appearance citation. (Burke stated that he had previously appeared in court each time he had received such citations). Burke also claimed that the requested weighing method was not only inaccurate but also not compelled by the relevant Kentucky statute. (KRS Sec. 189.223). He sought monetary damages against the defendants accordingly.
 
 
 3
 The case was originally scheduled for trial on May 11, 1983 by the district court. Settlement negotiations began after a pre-trial conference the preceding April. In hopes of furthering the settlement negotiation process, the court canceled the trial date and scheduled an informal progress conference on May 11. The trial court subsequently cancelled this scheduled informal conference after the plaintiff's counsel, James H. Moore, III, assured him that the parties had reached a settlement. On May 31 the defendant state police representatives signed an agreement worked out by Moore and defendants' attorney. Tendering of the check by the State of Kentucky was delayed due to administrative procedures involved. In late June attorney Moore informed the defendant state officials that plaintiff Burke did not plan to sign the agreement even if the $9,000 settlement check were tendered; Burke insists that he had never authorized the terms of any such settlement agreement.[1]
 
 
 4
 The magistrate, upon reference to him of the controversy, decided that Burke's claim about the unauthorized nature of the settlement agreement was 'frankly incredible.' Therefore, the magistrate concluded, even if Burke had not delegated settlement authority to others, he had ratified the settlement by his failure to object promptly.
 
 
 5
 The controversy surrounding Burke's knowledge of and apparent 'agreement' to the settlement evolved from his frequent out-of-town work schedules and his attorney's dealings with his father, Mac, and his brother, Michael. The magistrate recognized that nothing in writing authorized either the father or brother to accept a settlement agreement on plaintiff's behalf. Michael, the brother, had originally contacted counsel Moore about handling the case and gave Moore a check to cover fees.[2] At the hearing before the magistrate, Moore testified that plaintiff Burke always insisted on checking with his father about proposed settlement points during early negotiations. The father, Mac Burke, according to Moore, often informed him of his son's position during these negotiations.[3] After the lawyers had reached a final proposed agreement, Moore testified that Burke's father accepted the agreement for his son, who was out of town.
 
 
 6
 Burke emphasizes that he never gave any settlement authority to any member of his family or to his attorney. He testified at the hearing that neither his brother nor his father informed him of settlement negotiation process. On appeal, Burke also insists that his new counsel at the hearing, who had recently been a partner of former counsel Moore, refused to call his brother and father as witnesses. He insists, moreover, that no such settlement can be considered final until tender of the check and execution of the document.
 
 
 7
 It is well settled that the consummation of a contract agreement depends on an actual meeting of the minds between parties rather than the formalities associated with execution or delivery of documents. See, e.g., International Telemeter v. Teleprompter Corp., 592 F.2d 49, 56 (2d Cir. 1979). The magistrate, however, perceived a split of authority as to whether one party can demand enforcement of a settlement based upon the apparent authority exhibited by the attorney for an opposing party. The magistrate appeared to favor the view espoused by the court in International Telemeter, supra, which he construed as holding that an opposing party may rely on an attorney's apparent authority unless the party has reasonable grounds for doubting the scope of the attorney's agency power. See 592 F.2d at 55 ('[The opposing party] was entitled to rely upon the . . . [attorney's] authority so long as there was no reason to believe that he was exceeding it').
 
 
 8
 A different view about reliance on opposing counsel's apparent authority was espoused in United States v. State of Texas, 523 F. Supp. 703, 711 (E.D. Tex. 1981). The district court there stated that 'a settlement approved by the parties' attorneys is presumed valid, but can be subsequently declared void upon proof that either counsel lacked special authority from his client to enter into such an agreement.' Id. at 711 (emphasis added). State of Texas requires 'special authority' from attorneys on the assumption that 'in the civil arena, attorneys have no implied authority to compromise or settle their client's claims. . . .' Id. (emphasis added). We believe that this standard establishing a rebuttable presumption of special attorney authority contemplates the appropriate agency relationship between attorney and client as to authority to settle. See United States v. Beebe, 180 U.S. 343, 351-352 (1901).[4]
 
 
 9
 It is clear that attorney Moore possessed no such special authority as agent to settle Joe Burke's claim here. Moore conceded that he had nothing in writing from plaintiff Burke indicating Moore's own or anyone else's settlement authority. Moore's testimony also made no mention of any contact with plaintiff Burke directly about the progress of negotiations before settlement. Attorney Moore argued that his course of dealing with the Burkes actually gave him reason to think that father Mac possessed and exercised sufficient settlement authority. There is insufficient support for a determination that father Mac represented a secondary source of apparent authority on the bare assertions of the attorney whose actions are here in question.
 
 
 10
 The magistrate, however, also relied on a finding that Burke knowingly failed to express his disapproval of the proposed agreement within a reasonable time. It is settled that such a knowing failure can, in appropriate circumstances, have the legal effect of ratifying the agreement. See Williams v. International Association of Machinists and Aerospace Workers, 484 F. Supp. 917, 919-20 (S.D. Fla. 1978), aff'd per curiam, 617 F.2d 441 (5th Cir. 1980), cert. denied, 449 U.S. 840 (1980); see also State of Texas, supra, 523 F. Supp. at 711.
 
 
 11
 We find this record to be muddled and unclear on the question of plaintiff Burke's knowledge about the settlement. At one point during his testimony, plaintiff Burke stated that he had no conversations with attorney Moore about the settlement before the cancelled trial date of May 11:
 
 
 12
 Q. [Burke's counsel] Did Mr. Moore have any conversations with you about settling the case at the time around May the 11th for $9,000?
 
 
 13
 A. [Joe Burke] No.
 
 
 14
 Q. Did your father or brother ever tell you that this case was being settled?
 
 
 15
 A. No, they did not.
 
 
 16
 Q. When did it first come to your attention there was some offer of settlement in the case?
 
 
 17
 A. I don't really know the date, but it was after all this was already supposed to have been all fixed up according to Mr. Moore. He called me one day on the weekend and told me he needed me to come down and sign some kind of paper or something--I don't know what it was--for the settlement that he got. And I said what settlement. And he said the $9,000 settlement. And I didn't know nothing about it until he told me about it.
 
 
 18
 Joint Appendix A-36, 37.
 
 
 19
 The magistrate went on to assume that this conversation must have taken place in late June directly before the scheduled formal consummation of the settlement simply because this is 'consistent with his attorney's [Moore's] testimony.' Joint Appendix at A-42 n.2. But if plaintiff Burke did not learn about the proposed consummation of the settlement until a few days before, he cannot be found to have waited beyond a reasonable time to protest.
 
 
 20
 Moore's testimony was that he 'didn't feel' that the brother, Mike, had any apparent authority to settle plaintiff's case, but 'in his opinion,' Mac, the father 'did.' He testified specifically:
 
 
 21
 Mac had told me he would be talking to Joe. I heard nothing to the contrary, so the next day, which again, I believe would have been one or two days before the trial and probably the day of the settlement conference, I advised the attorneys for the State and the magistrate's office that . . . the matter was settled. (Emphasis added.)
 
 
 22
 .............................................................
 
 
 23
 ...................
 
 
 24
 * * *
 
 
 25
 I did not have any specific conversations with Joe Burke this one or two days before the trial
 
 
 26
 .............................................................
 
 
 27
 ...................
 
 
 28
 * * *
 
 
 29
 The magistrate attempted to solve this factual problem by declaring 'frankly incredible' the notion that Burke's brother or father failed to inform him in early May of the agreement in principle negotiated by Moore. (Joint Appendix at A-44). We find such conclusion to be questionable due to the total absence in this record of any testimony from Burke's father or brother. Regardless of what transpired between these family members, however, Burke deserved to be informed directly by his attorney, Moore, about the actual consummation of a settlement. We have great difficulty imputing knowledge of an actual settlement on the client's part based on assumptions about a family relationship described at trial only by the attorney who failed to inform his client directly, and who would stand to benefit substantially by receiving half of the settlement as a fee.
 
 
 30
 Plaintiff Burke stated that he did not remember the exact date of his phone conversation and rejection of Moore's proposed settlement. The magistrate surmised that this conversation must have taken place in late June by relying on Moore's remembrance of the events. During further questioning about the date by the magistrate, Burke stated that the conversation took place before the May 11 trial date:
 
 
 31
 [The Court]
 
 
 32
 Q. Mr. Moore called you prior to that trial date and said you're not going to trial; is that correct?
 
 
 33
 A. [Burke] He called me and told me he had a settlement.
 
 
 34
 Q. But you can't say when that call was, can you?
 
 
 35
 A. I can say it was before the May 11th, because I had it wrote down on the calendar when I was supposed to go to trial.
 
 
 36
 Q. And you didn't go to trial, did you?
 
 
 37
 A. No.
 
 
 38
 Q. Why not?
 
 
 39
 A. He called me and told me about the settlement and that's when I told him I didn't want the settlement. And he said he would be getting ahold of me later.
 
 
 40
 Q. But this is prior to May 11th, 1983?
 
 
 41
 A. Right.
 
 
 42
 Q. Even though you had a trial date scheduled you didn't ask him any more about it?
 
 
 43
 A. He said he would get ahold of me. Yes, I asked him what was going to happen and he said, 'I'll have to check into it and I'll get ahold of you later.'
 
 
 44
 Q. You didn't call him and ask him at any time between that time and June 29th, 1983? Six weeks you didn't call him and ask him about that?
 
 
 45
 A. No, because I took it that he was my attorney and he would get ahold of me when anything took place.
 
 
 46
 Q. You didn't have your brother call him and ask him anything about that?
 
 
 47
 A. No, I did not.
 
 
 48
 If this version of events were credited, that Moore informed plaintiff Burke of the proposed settlement in early May, Burke's behavior did not constitute a waiver ratification of the agreement. According to this version, Burke plainly informed his attorney that he would not accept the settlement. Burke reasonably expected his attorney to get back in touch with him soon, and he had no obligation to communicate this rejection directly to the opposing party.
 
 
 49
 In sum, we are not satisfied on the record that the district court should have enforced the agreement negotiated by the attorneys in this matter. The state of the evidence is simply insufficient for this court to affirm a ruling that prevents the plaintiff from having his day in court on the merits of the claim.
 
 
 50
 We therefore REVERSE and REMAND this matter to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 The $9,000 amount was to include attorney fees and costs. Evidence indicates that attorney Moore later claimed a lien for more than half of this amount
 
 
 [2]
 Plaintiff testified that he was reimbursing his brother for half the legal costs. Yet, as the magistrate pointed out, the plaintiff did not testify that Moore was ever informed about this reimbursement
 
 
 [3]
 We note the absence of any objection to Moore's testimony on hearsay grounds. Oddly enough, this testimony by Moore was willingly solicited and accepted by plaintiff Burke's new counsel
 
 
 [4]
 In International Telemeter, the court actually found that the attorney had special authority from his client to settle. 592 F.2d at 55 ('[The lawyer] had full authority to negotiate and consummate a settlement.')