**Glen STETSON, Plaintiff and Counterdefendant,**

v.

**Bob DUNCAN and Diamond Productions, Inc., Defendants and Counterclaimants.**

**No. 84 Civ. 0564 (JMW).**

United States District Court, S.D. New York.

May 25, 1988.

Stephen L. Baker, Baker & Friedman, New York City, for plaintiff and counterdefendant.

Barry Evans, Curtis, Morris & Safford, P.C., New York City, for Bob Duncan.

Edward J. Quirk, Seiler, Quirk & Tratos, Las Vegas, Nev., for Bob Duncan and Diamond Productions, Inc.

## ORDER

WALKER, District Judge:

The Court, after careful consideration of the record and Magistrate Grubin's Report and Recommendation dated March 15, 1988, and no objections thereto having been timely filed, hereby adopts that Report and Recommendation in all respects, for the reasons stated therein.

SO ORDERED.

## REPORT AND RECOMMENDATION

SHARON E. GRUBIN, United States Magistrate:

The subject of this Report is the defendants' motion for enforcement of a written settlement agreement prepared by counsel for the parties but never signed by plaintiff himself. For the reasons that will be set out below, I respectfully recommend that your Honor deny the motion. In light of my conclusion that the purported settlement of the action not be enforced, this report will also address a summary judgment motion that was earlier brought by defendant Duncan. My recommendation with respect to that motion is that it be denied as well.

This is an action for trademark infringement, dilution and unfair competition in connection with the name of a singing group formed in the mid–1950's, "The Dia-

monds." The group was very successful and had several million-selling records, including "Two Silhouettes on the Shade," "Little Darlin,'" and "The Stroll." Both plaintiff, Glen Stetson, and defendant, Bob Duncan, are lead performers in separate groups performing under the name "The Diamonds," and both perform the songs made famous by the original group. They both claim rights in the mark "The Diamonds" through various disputed assignments of the mark over the years as well as through common-law usage. The present motion requires a detailed exposition of its factual background.

This action was commenced in January 1984 and assigned to the Honorable Abraham D. Sofaer. After close to a year of initial skirmishes by the parties, Judge Sofaer referred the case to me for the handling of all pretrial discovery and motions, and I held a conference on November 28, 1984 at which time there were pending motions by defendant Duncan to compel discovery and to obtain a protective order concerning depositions. Current defendant Diamond Productions, Inc. (of which Duncan is president and owner), which had not been named as a defendant, had moved to intervene, and defendant Duncan had also moved for summary judgment. On December 6, 1984 I issued an order memorializing certain rulings made at the conference, granting Diamond Productions' motion to intervene and directing plaintiff Stetson to answer certain of Duncan's interrogatories and complete production of documents by

December 28, 1984. The order provided that the depositions of Stetson and Duncan, as to which there had been scheduling problems, were to be taken by January 4, 1985. The order further provided that another conference would be held on January 8, 1985 at which time oral argument would be heard on Duncan's motion for summary judgment and any additional discovery disputes that may have arisen in the interim would be resolved.[1] The order also expressly provided as follows:

> "The parties will be expected to report to the court at the conference on settlement negotiations, and counsel are hereby directed to meet prior to January 4, 1985 to engage in good faith settlement discussions. Counsel authorized to make any and all decisions concerning this case, including settlement thereof, are expected to be present pursuant to Fed.R.Civ.P. 16."

Thereafter, counsel for the parties immediately engaged in discussions to schedule their clients' depositions.[2] Because both plaintiff and defendant as performers were frequently traveling, it was difficult to arrange a schedule, and it was finally determined that both depositions would take place in Los Angeles commencing Tuesday, December 18, 1984.

Counsel also commenced serious settlement discussions on December 13, 1984. All discussions were had by telephone between Kathy N. Rosenthal of the New

---

1. With respect to the motion for summary judgment, I had already considered the papers prior to the November 28 conference. It was readily apparent that summary judgment should not be granted, because the central facts in support of the motion were adequately contested by Stetson. Thus, defendant Duncan claimed that plaintiff Stetson had assigned two-thirds of his interest in The Diamonds to certain individuals who had thereafter assigned it to Duncan's corporation, Diamond Productions. Stetson, however, denies that any such assignment by him was made and asserts that the only document Duncan submits to evidence Stetson's assignment contains a forgery of his signature. (See pages 672–74, *infra*.) Indeed, I asked Duncan's counsel at the November 28 conference how he thought he could obtain summary judgment given these disputed issues of fact. He conceded that these facts were contested, but, neverthe-

less, said he was not prepared to argue the motion on November 28 and requested that he be given the opportunity to review the papers first. Because the January conference was being scheduled in any event to see if there would be a possibility of settling the case and, if not, to set final discovery dates and prepare the case for trial, I acceded to his request and said he could address the motion at that time.

2. The factual information set forth herein, except where otherwise apparent or expressly indicated, has been derived from numerous affidavits and other submissions filed by the parties and their counsel and from the testimony and exhibits of the hearing held on this motion on June 11 and July 30, 1985. ("Tr." will refer to pages of the transcript of the hearing, and "Ex." to exhibits admitted thereupon.)

York firm of Marcus and Marcus, Stetson's attorneys, and Edward J. Quirk of Las Vegas, Nevada, Duncan's attorney, and there is no real dispute as to what occurred between them. Because the depositions the following week and preparation for them were expected to be quite expensive for both parties, they decided that settlement should be attempted prior thereto. Rosenthal and Quirk had numerous telephone discussions on Thursday, December 13 and Friday, December 14 which continued throughout the weekend. Late on Monday, December 17 they reached an agreement. Quirk has testified that throughout these conversations Rosenthal told him repeatedly that she could not respond to his various requests or proposals without talking to her client, Stetson, and told him that she would call Quirk back after talking with Stetson. She would later call back Quirk saying she had spoken with Stetson and reporting his comments which would then be folded into their continued discussions. According to Quirk, there was no doubt in his mind that Rosenthal was in constant contact with Stetson and that she had complete authority to settle the case. Rosenthal's testimony confirms that she was in continual contact with Stetson by telephone, although she describes her authority as complete authority to *negotiate* settlement which she distinguishes from authority to settle.

After agreement was reached over the telephone on December 17 Quirk immediately drafted a written settlement agreement containing the agreed-upon terms and sent it to Rosenthal by Federal Express (see Exs. 4, 5). Rosenthal called him on December 18 or 19 to say the draft was consistent with their oral agreement and that Stetson would be coming to her office to sign it, although it might be a couple of weeks because of the upcoming holidays and the fact that Stetson was traveling. She confirmed the substance of her call by letter of December 21 (Ex. 8).

On December 28 I received a letter dated December 20 from Quirk (Ex. 6), informing me that the scheduled January 8 confer-

ence would be unnecessary because the case had been settled "in principle," in that "[a]greement on all settlement terms was reached on December 17 by telephone" between Rosenthal and Quirk. Quirk's letter stated that "[t]he settlement obviated" the scheduled depositions and the further pleadings and discovery responses required by my order. He further informed me that he had sent the draft agreement to Rosenthal who had indicated to him that it correctly embodied the settlement terms although "some minor drafting changes may be needed" and that executed copies would not be available until January because of the holidays. I responded by letter to counsel of January 2 (Ex. 9), informing them that the January 8 conference would be adjourned, but only to January 16 unless a stipulation of dismissal were received by the court prior to then. Prior to Judge Sofaer's referring the case to me, he had scheduled a pretrial conference for January 11. In light of the events, on January 7 Rosenthal wrote a letter to Judge Sofaer informing him that the case had been "settled in principle" and seeking cancellation of that conference. She also told the judge as follows:

> "The delay in finalizing the agreement is one of scheduling. Our client, Glen Stetson, is an entertainer who performs 'on the road.' He has been and will continue to be, unavailable to us until January 14. We have arranged with Mr. Stetson to come in then to review the draft and execute a final copy, if possible. We do not foresee any problem arising which would prevent execution of the agreement in the near future."

On January 16 Rosenthal, on behalf of Stetson, and Barry Evans, local counsel for Duncan, appeared for the conference before me and showed me a copy of the settlement agreement which had not yet been executed. This brief conference was recorded as a matter of routine on the tape recording equipment in my chambers. In view of the importance now of what then occurred, I will set forth below a transcript of the entire conference made from the

recording: [3]

"MISS ROSENTHAL: The news is all good. We are just running a little behind schedule. I was able to speak to our client last night who again affirmed to me that the agreement—that the draft papers that we have now will be pretty much okay and he is due to come into the office on Friday. As soon as he can get a flight north. He is in Florida.

"THE COURT: Lucky.

"MISS ROSENTHAL: He says it is cold down there, too.

"MR. EVANS: Can't be this cold.

"THE COURT: No.

"MISS ROSENTHAL: If he braves the cold he will be in tomorrow or Friday and we should have it all done. It is just a matter of finalizing the papers now.

"THE COURT: So you expect by early next week a final stipulation.

"MISS ROSENTHAL: Well, we would have it prepared to send back to our adversary—it is going to take a while to get all the signatures on it.

"THE COURT: How long do you anticipate before the final stipulation is done?

"MR. EVANS: We will turn it around in 24 hours. I hope there is no hitch here.

"My purpose this morning is to convey to Your Honor that about a month now has gone by since the settlement was reached in principle. I would just refer to Mr. Quirk's letter of December 17 and Miss Rosenthal wrote a letter of December 20 and correspondence with Your Honor, also with Judge Sofaer, and representations that the case is settled but it is a full month that has gone by and we have not yet seen an executed copy or had any real response from Mr. Stetson, the adversary party himself.

"We are very concerned. We do not wish to let the matter go on more than a few more days if that is appropriate and we would urge that if the agreement is not signed in its present form or the most minor variations are appropriate, that we get back on the trial calendar and that the motion for summary judgment be heard and that the discovery go forward.

"MISS ROSENTHAL: I can understand Mr. Evans' concern. It has been a movement [sic] we have had a lot of trouble getting Glenn Stetson in.

"THE COURT: He is definitely coming tomorrow or Friday?

"MISS ROSENTHAL: Definitely. As fast as he can get a flight in. He just came in from Quebec where he has been for the last two weeks.

"THE COURT: All right. I am going to set this down for a conference and hearing on the summary judgment motion for next Wednesday.

"MR. EVANS: That is—Your Honor, I have a pre-existing commitment that day. Is there—if we can do it earlier or later, but that day I am simply not available.

"THE COURT: Thursday.

"MR. EVANS: Thursday.

"MISS ROSENTHAL: Okay.

"THE COURT: 9:30. If everything is settled before then, call here and send over the stipulation.

"MISS ROSENTHAL: Okay.

"THE COURT: You can send me the original and I will forward it to the judge for signature. (Inaudible.) I don't hear anything before Thursday, I will expect to see you here.

"MR. EVANS: That's fine.

"MISS ROSENTHAL: Ready to argue the motion for summary judgment. Okay.

"MR. EVANS: Would it be appropriate at this time for me to offer into the record a copy of the proposed settlement agreement?

"THE COURT: Well, I don't know what good that would do. I am curious as to the terms, though. If you can tell me.

---

**3.** The recording was played for the parties during the evidentiary hearing on the present motion and transcribed into the record of that proceeding by the court reporter at that time (see Tr. at 144–151).

"MR. EVANS: The terms are that a joint application—joint trademark application, application for registration will be filed in the names of both Stetson and The Diamonds, The Diamonds being the group that Mr. Duncan is a member of. All other existing applications will be expressly abandoned.

"At the time the new joint application is filed, Mr. Stetson will execute a separate document assigning all of his rights, title and interest to Diamond Productions. It will be one new trademark incorporating all the rights, Stetson's rights in that application will be assigned to Diamond and Stetson will receive back an immunity, a license, a covenant not to sue from Diamond which will permit Stetson to use the mark, The Diamonds, in a proscribed [sic] fashion. That fashion is he may use The Diamonds but he must say Glenn Stetson must not appear in less than one-fourth the type size of The Diamonds.

"So whereas all rights will be owned by The Diamonds, they will grant him immunity to use the name in that proscribed—prescribed fashion. The Diamonds being the owner of the new application will then have the right to sue infringers and there are some minor additional terms with respect to proceeding against third-party infringers and so forth.

"MISS ROSENTHAL: That is the sum and substance. That neither party shall interfere with the rights of the other to work in whatever fashion they choose to.

"MR. EVANS: If Your Honor would like, I have a copy of the settlement agreement. This is a proposed—

"[MISS ROSENTHAL]: I just handed her a copy of what I have.

"MR. EVANS: Okay. This is the new proposed application—

"MISS ROSENTHAL: Which I believe I also—I have a copy of it, I believe. I just don't have it attached.

"MR. EVANS: That is the assignment.

"MISS ROSENTHAL: Yes, you have seen both of those.

"MR. EVANS: It fits together.

"MISS ROSENTHAL: We don't foresee any problem. Glenn Stetson did consent to the terms on the telephone with me during the negotiations in December and then again yesterday.

"THE COURT: If a problem should arise, I want to get on with the case.

"MISS ROSENTHAL: I assume we are very close to settling it next Tuesday, that you would give us another week—

"THE COURT: I want to know that this is either settled or off my back if it is not settled. And I will decide a summary judgment motion by the end of this month. We will try that.

"THE COURT: If the problem is [he] can't come up here, I don't know why you can't ship them by courier, whatever. I don't know what the delay should be if in fact it is agreeable to you.

"MISS ROSENTHAL: We wanted to talk it out face to face. It is better that way.

"THE COURT: I would suggest you fly to Florida.

"MR. EVANS: I will go, too.

"MISS ROSENTHAL: Why didn't I think of that?

"MR. EVANS: At plaintiff's expense.

"THE COURT: Okay?

"MR. EVANS: That's it.

"MISS ROSENTHAL: Thank you very much.

"MR. EVANS: Thank you very much."

On Wednesday, January 23, the day prior to the day counsel were due to appear again, Rosenthal called chambers and informed my secretary that although the agreement had still not been signed, since it would definitely be signed shortly, she suggested the conference again be adjourned. I had my secretary inform her that I would adjourn it one more time for another week, to January 30, at 2:30 p.m. On the morning of January 30 Rosenthal again called and spoke to my law clerk. She told him that she had been on the telephone with Quirk for hours, that they were "very close to an agreement" and

that they did not want to have to "bother" me with the summary judgment motion and other proceedings in view of the circumstances. The substance of these telephone calls to chambers set forth herein is based on notes made in our file by my secretary and my law clerk at the time of the calls. Unfortunately, our procedure seems to have been not fully kept, for there is no record of what was done by me as a result of the January 30 call. I do not recall whether another date for the conference and argument on the summary judgment motion was set, but I do recall that at least two additional calls were received by us from Rosenthal over the subsequent two weeks, again promising submission of the stipulation within a matter of days.

What was happening between Rosenthal and Quirk during this time is clear from their testimony and correspondence. About the middle of January Rosenthal had told Quirk that Stetson had looked over the agreement and had accepted it but wanted some minor changes which she and Quirk then worked into the agreement. On February 4 Rosenthal sent to Quirk another draft of the settlement agreement reflecting the new terms they had worked out over the preceding two weeks [4] and enclosing a draft stipulation of dismissal and additional documents provided for by the agreement: a general circulation letter for the public, an assignment and a trademark application (Exs. 12–15). Rosenthal stated in her cover letter that as she anticipated return of these documents by the end of the week, she intended "to have Glenn here [New York] then to sign same." (Ex. 11.)

On February 14 Stephen L. Baker, Esq. appeared in my chambers stating that he represented Glen Stetson in this matter, that he wished to look at the court file which was then in my chambers and that he wished to speak with me. He said that Stetson had asked him to become involved, that the case had not been settled and that

he would be advising Stetson to reject the settlement that had been "proposed." I told him that it would be inappropriate for me to speak with him *ex parte* and, moreover, insofar as Marcus and Marcus were the attorneys of record for Stetson and he had not filed a notice of appearance or otherwise made his role clear, I believed it inappropriate for him to be making any representations of any kind to the court. My secretary then called Ms. Rosenthal in an attempt to learn the status of the situation. Rosenthal, to put it simply, expressed surprise at Baker's appearance and said as far as she knew, she was counsel for Stetson, she had never heard of Mr. Baker and the case had been settled. Later that day Baker apparently called defendant Duncan's New York counsel and told him he had been asked by Stetson to give a "second opinion" on the case and on the following day called Rosenthal's partner, Clark Marcus, to inform him of his involvement. After a period of confused activity by the various counsel, irrelevant to the issues now before the court (such as whether Marcus and Marcus was required to release its files to Baker), Marcus and Marcus filed a motion to be relieved as Stetson's counsel, which I granted, and the defendants filed their motion to enforce the settlement agreement.

While all the facts set forth above are undisputed with respect to the discussions between Rosenthal and Quirk resulting in the written draft of the settlement agreement and their informing the court that the case had been settled, sharp dispute does exist between Rosenthal and Stetson himself as to her conversations with him and whether he ever authorized her to settle the case on the proposed terms. He maintains that while he authorized Marcus and Marcus to pursue settlement negotiations on his behalf, he never agreed to the terms of the settlement embodied in the document (Ex. 14) defendants are now seeking

---

**4.** These changes were apparently for the most part those wanted by Stetson or Rosenthal. One was that Stetson's business be done in the form of a corporation and the proposed assignment was to be therefore to the new proposed corporation rather than to Stetson personally.

Additional terms included a provision for nondisclosure and permission for Stetson to use for business purposes the remainder of his stationery which had merely "The Diamonds" printed on it. (See Ex. 14 and Tr. at 38–41.)

to enforce. He claims that he specifically rejected those terms insofar as they would dilute his purported exclusive ownership of the trademark and told Rosenthal and Clark Marcus that any settlement would have to include a license from him to Duncan rather than from Duncan to him. He says that he was never apprised of the December/January discussions and correspondence between Rosenthal and Quirk nor their communications to myself and Judge Sofaer indicating a settlement had been reached. While he acknowledges being in frequent telephone contact with Rosenthal during this period, he claims to have been continuously rejecting the defendants' proposals she was asking him to consider during those conversations despite pressure by her for him to accept them. Rosenthal, on the other hand, steadfastly maintains that Stetson was informed of all her discussions with Quirk, that she acted only at his direction, that he was consulted on every step she took and that he approved every term in the agreement.

Because I have concluded, as will be discussed below, that the settlement agreement cannot be enforced due to the lack of its formal execution by Stetson, it is unnecessary for me to set forth my findings as to whether it is Stetson or Rosenthal who has been untruthful because my belief on that issue is irrelevant to my conclusion. However, given the circumstances of this case and the lengthy record that has been made on the issue, given that the case is to be tried not to the court but to a jury which will independently assess any issues of credibility, and particularly given my belief that someone who is readily willing to make misrepresentations to the court should not be led to believe he has prevailed on this motion through this most distasteful of means, I wish to state that it was quite clear from the first session of the evidentiary hearing that Stetson was not telling the truth. I make this finding as a result of the man's demeanor as well as the evidence presented on this motion. I believe that Stetson for the most part has seen fit to tailor his sworn statements to whatever "facts" he believed would be helpful to him at various times. Insofar as

this issue is irrelevant to my recommendations on the matters before the court, I will not detail the reasons for my finding. Perhaps one instance, out of the numerous instances of Stetson's distortions, will suffice as an example of the basis for my finding. In conjunction with his answering papers opposing this motion for enforcement of the settlement agreement, Stetson submitted an affidavit sworn to April 9, 1985. He explained that his relationship with Marcus and Marcus began to deteriorate in December of 1984 when Clark Marcus told him the amount of attorney's fees that would be necessary for discovery over the next few months and the amount fees could total for the entire case. He states that Marcus told him that Marcus would not attend the depositions to be taken in California in January 1985 unless he paid Marcus more than he had already paid. He says Marcus also told him that the defendants were anxious to reach a settlement and had proposed one whereby Stetson's group could perform under the name "Glen Stetson and the Diamonds" while defendants' group would be known as "The Diamonds." He says that he rejected that offer and that thereafter he spoke to his "personal attorney" in Florida, a trademark attorney in Washington, D.C. and his agents and that all agreed the proposal was unacceptable. He then states:

> "In any event, on January 15, 1985 in a good faith attempt to resolve matters, I met with Mr. Marcus and Ms. Rosenthal in their offices in New York. *For the first time I was given a copy of the proposed agreement. This is the only agreement I have ever seen.* I then left New York without having accepted the proposed settlement agreement. Upon my return to Florida, I called [the trademark attorney in Washington, D.C.] and reviewed the proposal with him. I then immediately called Mr. Marcus and told him that there was no deal, that I simply would not agree to this settlement."

(Affidavit of Glen Stetson, sworn to April 9, 1985, at ¶ 12 (emphasis added)). On July 23, 1985 the second session of the evidentiary hearing on this motion was held. At

that time, Stetson testified in detail about his trip to New York on January 15, 1985 and, for reasons that are now irrelevant, believed it in his interest during that testimony to establish that he had not discussed the settlement agreement with Rosenthal or Marcus on that date. His direct testimony included the following:

"Q. *Did you see the settlement agreement on the 15th?*

A. *No.*

Q. Did you have any discussions concerning settlement?

A. They told me they were going to write a brilliant contract.

Q. *Did they tell you that a settlement agreement had already been prepared?*

A. *No. They said they were working on a settlement.*

Q. *You had previously seen a settlement agreement back in December, I believe.*

A. *Right,* which I had rejected."

(Tr. at 170.) Thus, while Stetson swore to the court in April 1985 that he discussed the settlement agreement with Marcus and Rosenthal on January 15 and that he was given a copy for the first time on that date, in his testimony in July 1985, blithely ignoring his affidavit and without explanation, he stated under oath that he did not see a settlement agreement on January 15 and that he had seen one back in December.[5] Precisely what happened on January 15 and whether Stetson first saw a draft agreement on that date or had seen it earlier turns out to be wholly irrelevant to any issue herein. This series of statements, however, is but one of a host of contradictions and inconsistencies put forth by Stetson.

Based on all the evidence herein, which I have considered exhaustively, I believe that Stetson did agree orally to at least the substance of the settlement terms, working them out with Rosenthal over the telephone during the December/January period and, in large part, relying upon Rosenthal and Marcus as his attorneys when they advised him as to various terms. I believe that the "delay" in Stetson's execution of the agreement was caused in large part by the fact that he was unable to pay the fees of Marcus and Marcus as they became due and that, perhaps based upon what I find to be professionally distasteful statements by Rosenthal and Clark Marcus, Stetson did not feel he could arrive in New York to sign the agreement without some attorney's fees in his pocket. (See, *e.g.,* Exs. 17 and 18 where Rosenthal told Stetson on December 21 and again on December 28, 1984 that some payment on his bill would have to be made before the agreement could be executed and that delay in payment would jeopardize the settlement and the case; see also Tr. at 116–18.) I believe that as time was closing in on Stetson he got "cold feet" about the settlement terms and, after having had Rosenthal do the work, did ask other attorneys whether he should go through with it. I believe that in a mistaken belief that, in order to proceed with the case and to not pay the fees owed to Marcus and Marcus for their work on the settlement, he would have to establish that he had never agreed with Rosenthal to the terms as they then appeared in writing and that she had not even discussed them with him, Stetson has not been truthful with the court nor with

---

5. See also the April 9 affidavit at paragraph 15 where Stetson, in an effort to show at that time that although Rosenthal told the court the case had been settled in principle, she wrote to him on December 28, 1984 asking him to come to New York to review the agreement, asks rhetorically in the affidavit, "how could I [have] agree[d] to something that I had not seen, and never had read, or otherwise explained [sic] to me."

Additionally, attempt to reconcile with the foregoing the following testimony Stetson gave at the first session of the evidentiary hearing in June 1985, approximately two months after his affidavit and six weeks earlier than his July testimony:

"THE COURT: When is the first time you personally saw any of the drafts of the settlement agreement?

THE WITNESS: They [Marcus and Marcus] sent me a copy.

THE COURT: Do you know when that was?

THE WITNESS: I honestly *can't recall.* I think it was *in December....*"

(Tr. at 134–35.)

his new attorney. It is this explanation of events that alone makes sense out of all the evidence. It also answers to a large extent the question that had been nagging me since the inception of this dispute: why would Rosenthal have spent very substantial amounts of time and effort, including nights and weekends, in working out an agreement and reducing it to writing if her client were consistently rejecting its terms each time she discussed them with him, and why would she have continually represented to the court and her adversary that he had agreed and his signature was forthcoming if she knew he would not sign it. As I have said, however, this issue is irrelevant because I conclude that this agreement cannot be enforced insofar as it was never signed by him and the evidence establishes that none of the parties or the attorneys considered it would be final without signature.

## DISCUSSION

Defendants contend that the agreed terms reached between Quirk and Rosenthal on December 17 and embodied in the written draft of the settlement agreement which was shown to me at the January 16 conference should be enforced as a binding contract against Stetson because Rosenthal, as Stetson's attorney, had the authority to enter into a binding settlement agreement on his behalf and that she did so. They argue that the credible evidence shows her to have had not just apparent authority to do so but also actual authority from Stetson to do so and that execution of the agreement by the parties after it was committed to writing was to be merely a ministerial act. There is no doubt that Rosenthal had not just apparent, but actual authority to *negotiate* for Stetson and that both she and the defendants' lawyers believed they had reached an agreement on the terms of a settlement. The problem with the defendants' argument, however, is that because it is clear that neither Rosenthal nor the defendants' lawyers ever thought their agreement would be "final" prior to their clients' signatures on it, there was not even apparent authority to bind Stetson to such an agreement prior to its

execution and there is, therefore, no agreement that can be enforced.

It is clear under New York law (which the parties agree controls here) that if any party to an agreement does not intend to be bound until that agreement is in writing and signed, there is no contract until then even if the parties have orally agreed upon all the terms. This principle has been consistently upheld by this court and the Second Circuit as well as the courts of the state of New York. *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984); *Health Learning Systems, Inc. v. Thompson Medical Co.*, No. 84 Civ. 7839, slip op. at 3 (S.D.N.Y. May 11, 1987) [1987 WL 11168]; *Precision Testing Laboratories, Ltd. v. Kenyon Corp. of America*, 644 F.Supp. 1327, 1342–43 (S.D.N.Y.1986); *Davidson Pipe Co. v. Laventhol and Horwath*, No. 84 Civ. 5192, slip op. at 5 (S.D.N.Y. Feb. 11, 1986) [1986 WL 2201]; *Reprosystem, B.V. v. SCM Corp.*, 522 F.Supp. 1257, 1275–77 (S.D.N.Y.1981), *aff'd in part, rev'd in part on other grounds*, 727 F.2d 257 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *Scheck v. Francis*, 26 N.Y.2d 466, 469–70, 311 N.Y.S.2d 841, 843, 260 N.E.2d 493, 494 (1970). As the Second Circuit has explained, "Because of this freedom to determine the exact point at which an agreement becomes binding, a party can negotiate candidly, secure in the knowledge that he will not be bound until execution of what both parties consider to be final document [sic]." *Winston*, 777 F.2d at 80. *See also R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 74–75.

In *Winston*, much like the situation here, the attorneys for the parties reached an agreement in principle to settle the case and thereafter exchanged a number of drafts of a proposed written agreement that were worked out by them over the telephone. Believing it to be final, the defendants themselves had signed the "third draft" prior to their counsel's sending it to plaintiff's counsel. They also executed and sent a promissory note, a check

representing payment pursuant to the agreement and a stipulation of discontinuance of the action that was signed by their counsel. Their counsel's transmittal letter to plaintiff's counsel stated that all of these documents were to be held in escrow pending return to him of copies of the agreement and stipulation executed by plaintiff. Upon receipt of these documents plaintiff's attorney contacted defendant's attorney because certain language changes that had been made by defendant's attorney in the agreement had not been discussed with him, and they then agreed upon some additional changes. Plaintiff's attorney then sent an unexecuted "fourth draft" back to defendant's attorney, reflecting these modifications. Thereafter, defendant's counsel informed plaintiff's counsel that the settlement could not proceed because his clients were dissatisfied with it. The particular terms with which they purportedly were dissatisfied, however, had apparently been part of the "third draft" which they had previously executed.

Upon plaintiff's motion, the district court found that the parties had entered into a binding settlement agreement which plaintiff could enforce. The Second Circuit reversed, holding that no agreement could be enforced because the parties had not intended that a binding agreement would be reached prior to execution by both sides of a final document. The court emphasized the principle of law that has long been controlling in such circumstances, that it is the intent of the parties that will determine the time of contract formation and if either of them intended not to be bound until full execution of a document, "no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." 777 F.2d at 80. The court articulated four factors it had previously established in *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 75–77, for discerning whether parties intended to be bound in the absence of a document executed by both: (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial perform-

ance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. 777 F.2d at 80–81.

In determining intent, the court is not to look at the parties' "after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time," and only "[i]f the parties' expressions and conduct would lead a reasonable man to determine that they intended to reach a binding agreement, their agreement will be enforced." *Reprosystem, B.V. v. SCM Corp.*, 522 F.Supp. at 1275. Thus,

> "[t]he parties have power to contract as they please. They can bind themselves orally or by informal letters or telegrams if they like. On the other hand, they can maintain complete immunity from all obligation, even though they have expressed agreement orally or informally upon every detail of a complex transaction. The matter is merely one of expressed intention."

*Id.* at 1276 (quoting 1 A. Corbin, Contracts § 30, at 98–99 (2d ed. 1963)).

Although enforcement of the draft agreement in the instant case may be indeed a tempting proposition, it cannot be done for there is no doubt that no one, neither the parties nor their counsel, intended any agreement to be binding and enforceable until signed by the parties. Thus, even if we assume that Stetson had agreed to all the terms embodied in the draft, it is nevertheless the case that neither he nor Rosenthal nor the defendants believed him to be legally committed to those terms or intended him to be so until formal execution. The contemporaneous record of events is replete with the evidence of this understanding and intent on both sides.

Upon reaching agreement with Rosenthal over the phone on December 17, defendants' attorney Quirk immediately drafted a written agreement and sent it to Rosenthal. His cover letter told her he hoped the document would be acceptable as written,

and he stated, "I think that we should pursue signatures at the earliest possible date in order to have it wrapped up well prior to our next scheduled court appearance." (Ex. 4.) With respect to this letter and draft agreement sent by Quirk, Rosenthal testified as follows:

"Q. I am going to show you what has been marked as Defendants' Exhibit 4 and refer you to a section that Mr. Quirk writes, 'I think we should pursue signatures at the earliest possible date in order to have it wrapped up well prior to our next court scheduled appearance.'

Was that your understanding that this agreement would be signed before it was binding?

A. As an attorney, yes."

(Tr. at 105.) In his letter to me of December 20, Quirk advised that the case had been settled "in principle," that Rosenthal had told him that his draft agreement was acceptable although some minor drafting changes might be needed and that execution would not occur until January. (Ex. 6.) In the letter of January 7 Rosenthal sent to Judge Sofaer, she, too, referred to the settlement as one "in principle" and told the judge that she had arranged for Stetson to come to New York later that month "to review the draft and execute a final copy, if possible." She added, "We do not foresee any problem arising which would prevent execution of the agreement in the near future." (Ex. 10.) Rosenthal testified that she sent this letter "to preserve our client's right to come in and review the agreement." She explained:

"It was my understanding that the agreement as we had negotiated it was going to conform—well, it had in fact conformed with all the client's directions up until the time—all throughout our negotiations.

But knowing that people invariably can and do change their minds, it was important to preserve the client's right to come in and review the agreement before he signed it.

I used this to buy us some time until Mr. Stetson could come into the office and we could in person review all of the terms of the agreement as we negotiated them."

(Tr. at 88.)

Rosenthal's letter to Stetson of December 21, 1984 again indicates her belief that the settlement was not binding at that point and confirms that Stetson himself could not have believed there would be a settlement without his signature:

"To follow up our conversation of Wednesday, we have determined that it would be best for you to come here to review the agreement prepared by Ted Quirk.

As we discussed you *must* make an effort to bring your bill current *before* the agreement is executed. Nonexecution within a reasonable time will surely jeopardize your entire case.

\*    \*    \*    \*    \*    \*

I think it would be appropriate for you to give me a call upon receipt of this letter so that arrangements can be made for your review and execution of the proposed settlement agreement...."

(Ex. 17, emphasis in original.) This letter was apparently not received by Stetson in due course, so Rosenthal sent another copy of it on December 28, 1984 with a short note telling Stetson not to delay their meeting for "[i]t could jeopardize the settlement." (Ex. 18.) [6]

---

**6.** Stetson did come to New York in January. There was much testimony concerning the date he came, why the agreement was not executed on that date and, indeed, whether the agreement was even discussed between him and Rosenthal at that time. (See pages 663–64, *supra,* and Tr. at 163–256.) While the bulk of the testimony on this factual issue turns out to be irrelevant, it should be noted that Rosenthal testified that there was a disagreement within her office as to whether or not Stetson should be given a copy of the agreement at that time. The con-

cern was that if Stetson physically received the agreement prior to paying the fees he owed Marcus and Marcus, "he would take it and sign it and we'd never get paid." (Tr. at 181.) This is further evidence of the belief that the agreement would not be final until executed. Rosenthal also testified that there were a few minor points she and Quirk still needed to negotiate before the agreement was finalized. (Tr. at 178, 183–84, 249–50, 251–53; see also Rosenthal Affirmation, dated February 22, 1985, at ¶ 12.)

When counsel appeared before me on January 16, 1985, the focus of the conference was a date by which the *proposed* settlement agreement would be executed. It was quite clear to counsel (and me) that the action would not be settled and dismissed until formal execution of an agreement. I refer your Honor to pages 659 to 662 above where I have reprinted a transcript of this conference, but a portion of it bears repeating here for it surely belies defendants' counsel's posture on this motion that signature was intended only as a mere formality:

"THE COURT: So you expect by early next week a final stipulation.

MISS ROSENTHAL: Well, we would have it prepared to send back to our adversary—it is going to take a while to get all the signatures on it.

THE COURT: How long do you anticipate before the final stipulation is done?

MR. EVANS: We will turn it around in 24 hours. I hope there is no hitch here.

My purpose this morning is to convey to Your Honor that about a month now has gone by since the settlement was reached in principle. I would just refer to Mr. Quirk's letter of December 17 and Miss Rosenthal wrote a letter of December 20 and correspondence with Your Honor, also with Judge Sofaer, and representations that the case is settled but it is a full month that has gone by and we have not yet seen an executed copy or had any real response from Mr. Stetson, the adversary party himself.

*We are very concerned. We do not wish to let the matter go on more than a few more days if that is appropriate and we would urge that if the agreement is not signed in its present form or the most minor variations are appropriate, that we get back on the trial calendar and that the motion for summary judgment be heard and that the discovery go forward."*

(Tr. at 145–47.)

On January 29, 1985, after further negotiations with Quirk, Rosenthal sent a copy of their latest draft agreement to Quirk's local counsel with a letter that again clearly shows the intent not to be bound prior to signature. It stated:

"Enclosed is a copy of the Agreement submitted by this office to Ted Quirk yesterday. We reviewed it on the telephone today and I made notes pursuant to his comments. . . . I have also designated those paragraphs which require further attention.

I will be calling Ted this evening to finalize the Agreement. I am sure everything can be worked out. We have not spent the last two months in serious negotiations with the intention of backing away now.

Magistrate Grubin is expecting to hear from us tomorrow morning. If the agreement is not finalized, we must proceed with the motion for summary judgment. The appearance is scheduled for 2:30 Wednesday."

(Ex. C.) It was the following morning that Rosenthal called chambers requesting another adjournment and told my clerk that the parties were "very close" to an agreement. On February 27, 1985, after Stetson's new counsel had emerged and the settlement disavowed, Clark Marcus sent a letter to Stetson concerning the office files and Stetson's nonpayment of fees. One portion of that letter is relevant herein:

"I suggest that you keep in mind the fact that the work we performed was done at your specific instance and request and while you are not obligated to sign (or go forward with the settlement agreement), the fact that same may not be to your liking does not relieve you of your obligation to pay for legal fees."

(Ex. E.) And in testifying about this statement in Marcus' letter, Rosenthal reiterated that it was their "general office policy that although we negotiate on behalf of the clients and we do the best job we can for the clients, certainly it is in a client's prerogative to change their mind. . . ." (Tr. at 110.)

All of the foregoing make it plain that the following testimony of Rosenthal at the evidentiary hearing did, indeed, accurately portray her thinking at the relevant period:

"Q. Miss Rosenthal, was it always your intention that Mr. Stetson sign an agreement before he became bound to it?

A. As an attorney it is always my practice that a written agreement is not finished until signed. This was a written agreement that was contemplated to be signed."

(Tr. at 105.)[7] Quirk himself testified that it was his and Rosenthal's "intention that [the settlement agreement] be signed by the parties" (Tr. at 47–48), although defendants now argue that such signing was intended merely as a ministerial act. I find that defendants' counsel's "words and deeds which constitute[d] objective signs" back at that time, *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 74, belie this contention (*e.g.*, counsel's "concern" expressed at the conference of January 16, 1985), but, even assuming *arguendo* that the defendants intended formal execution as only a purely ministerial act, plaintiff and his counsel clearly intended more—that plaintiff would not be bound until that event—and that intent was communicated in the numerous events set out above.[8] If any party to an agreement does not intend to be bound until the agreement is in writing and signed, "then there is no contract until that event occurs." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 74. *See also Winston v. Mediafare Entertainment Corp.*, 777 F.2d at 80 ("if either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract"); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d at 261; *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

As I believe the foregoing evidence so plainly establishes the intent not to have been bound prior to signature, it is unnecessary to further examine the events under the four-factor test laid out by our Court of Appeals in *R.G. Group* for discerning intent in circumstances where it is not so clear (see page 666, *supra*). Nevertheless, briefly considering the four factors, we may conclude as follows.

The first is whether there was an express reservation of the right not to be bound prior to signature. As we have just discussed how the foregoing "words and deeds" of Rosenthal show her reservation, we need not address this point further. *See, e.g., Davidson Pipe Co. v. Laventhol and Horwath, supra,* slip op. at 6–7 ("Neither party expressly reserved the right not to be bound prior to the execution of the document, but their correspondence and actions reveal such an intent.") However, one of the changes Rosenthal made to Quirk's original draft of the agreement might additionally be noted in this regard.

---

7. See also Tr. at 83 where Rosenthal stated the following in response to a question posed by Quirk:
    "I object to your calling it a settlement. The final terms of the settlement, my power is always to negotiate the terms of the agreement. But that is the issue here. It is not signed until it is signed."

8. Additional relevant testimony of Rosenthal may be found on pages 111–12 of the transcript:
    "Q. Do you distinguish between the authority to settle and the authority to negotiate?
    A. For some purposes, yes, I believe there is a distinction between the authority to negotiate and the authority to settle.
    Q. Have you made that distinction today throughout your testimony?
    A. Yes, I have. We always had the ability to negotiate on behalf of Mr. Stetson. Of course we couldn't commit him without—
    Q. I understand. They wanted to commit me, see ...
    A. We needed him to come into the office to read the agreement as last written and say yes, this is exactly it.
    Q. Did you communicate to Mr. Quirk and to the court that you expected Mr. Stetson to come into the—
    A. Yes, I did. Because—I am sorry, go ahead.
    Q. You expected him or requested that he come in, review I believe is one word that was used, confirm, and sign the agreement?
    A. Yes, we did request him to do that and yes, we expected that is what he was going to do.
    He always gave us to believe that these were his instructions and we were acting on his behalf. He changed his mind at the last minute.
    Q. He was to come in and review?
    A. Yes, review the words as written."

Paragraph 3 of Quirk's December 17 draft provided as follows:

"3. Concurrent with the execution of the aforementioned application to register the Mark, Stetson shall execute a separate document assigning all of his right, title, and interest in the Mark to Diamond Productions...."

(Ex. 5.) When Rosenthal transmitted her re-draft to Quirk, paragraph 3 read as follows:

"3. Simultaneously with *the execution of this Agreement* and the aforementioned application to register The Mark, Plaintiff shall execute a separate document assigning, except as specifically reserved by Plaintiff below, all of his right, title and interest in The Mark to Diamond Productions...."

(Ex. 13, emphasis added.) *See, e.g., Davidson Pipe Co. v. Laventhol and Horwath, supra,* slip op. at 7 (similar provisions attached "great significance to the execution date and may be viewed as 'impediment[s] to forming a binding agreement prior to some formal time of execution'"). The second factor of the *R.G. Group* test, whether there had been partial performance of the agreement, is inapplicable here (although it may be noted that, in anticipation of the consummation of the agreement, Rosenthal filed a formal certificate of incorporation forming Stetson Productions, Ltd. (see Rosenthal Affirmation, dated February 22, 1985, at ¶ 17)). The third factor, whether all of the terms of the agreement had been agreed upon, is debatable, since Rosenthal maintains to the present day that she still planned to make some modifications and Quirk knew that she had some in mind. Her question to me in the presence of defendants' counsel at the January 16 conference confirms that they did not consider the case "settled": "I assume [if] we are very close to settling it next Tuesday, that you would give us an-

other week—" (Tr. at 150). It is fair to say, however, that the essential terms of the agreement had been resolved and the subsequent changes and intended changes of which we know may be characterized as minor.[9] Finally, the answer on the fourth factor, "whether the agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception," *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d at 76, has to be a definite affirmative. Parties to a hotly contested trademark dispute generally do not settle it without a formal agreement. Indeed, defendants here acknowledge the necessity for a written agreement, merely arguing that the last draft should be enforced as if executed.

Defendants rely heavily on the decision of the New York Court of Appeals in *Hallock v. State,* 64 N.Y.2d 224, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984), in support of the motion. *Hallock,* however, did not involve the issue with which we are concerned herein and defendants' reliance is, therefore, misplaced. *Hallock* involved two plaintiffs who had sued over the condemnation of a parcel of real property. After five years of litigation, on the morning trial was to begin, counsel for the parties after discussion agreed to a settlement. This settlement was reached in open court before the trial judge, and the terms of the agreement were dictated into the record. The judge then asked the attorneys for each side separately if they agreed to the settlement, and the judge noted that, according to court rules, this settlement "finalized the case." The case was then removed from the trial calendar. One of the two plaintiffs was present in court throughout these proceedings and remained silent. The other plaintiff was ill and not present at all. Two months later

---

**9.** Yet, in this regard we may note the following statement of the Court of Appeals in *Winston v. Mediafare Entertainment Corp.:*

"Although the district court may have correctly assessed the parties' characterizations of the relative importance of the later changes, the facts that such changes were minor and that oral agreement was actually reached on

all of the remaining terms does not necessarily lead to the conclusion that the parties were bound prior to these modifications. Nor does it indicate an intent to give up the right to be bound only upon execution of a formal document."

777 F.2d at 82.

both plaintiffs moved to vacate the stipulation of settlement on the ground that their attorney had not had their authority to enter into it. The New York Court of Appeals held that the plaintiff who had been present in court could not be heard to challenge the settlement because his silence amounted to acquiescence and consent. The court held the absent plaintiff also bound to the agreement, finding that he had clothed his attorney with apparent authority. There was no question in *Hallock* of whether the attorneys had agreed to a binding settlement on behalf of their clients. It was crystal clear that a stipulation was entered into which was intended to bind the parties and close the case, and it was made in open court. The court noted (quoting one of the Appellate Division justices from the decision below) that "to set aside this settlement stipulation 'invites destruction of the process of open-court settlements, for every such settlement would be liable to subsequent rescission by the simple expedient of a litigant's self-serving assertion, joined in by his attorney and previously uncommunicated to either the court or others involved in the settlement, that the litigant had limited his attorney's authority.'" 64 N.Y.2d at 232, 485 N.Y.S.2d at 514, 474 N.E.2d at 1182.

Defendants herein would like to equate counsel's appearance before me at the January 16, 1985 conference with the unequivocal open court settlement stipulation of *Hallock*. But such cannot be done, of course, because no settlement was entered into here. Indeed, the conference concerned itself with the question of when Stetson would be coming to New York to review the draft agreement and sign a final version. As is patently clear from the transcript (see pages 659–62, *supra*), nobody at this conference—neither Stetson's counsel, nor defendants' counsel nor myself—viewed Rosenthal as having apparent authority to bind Stetson to any settlement on that date nor viewed the case as settled so as to dismiss it. Indeed, defendants' counsel asked that proceedings continue if the agreement were not signed in a few

days, and I adjourned proceedings until the following week.

Similarly unavailing are the additional cases upon which defendants put particular reliance. (See Memorandum of Points & Authorities in Support of Defendants' Motion to Enforce Settlement Agreement at 10–14 and Letter from Barry Evans, Esq. to the Court, dated Dec. 12, 1986.) *Janus Films Inc. v. Miller*, 801 F.2d 578 (2d Cir. 1986), involved a settlement reached during trial before Judge Ward which was reported in open court. Judge Ward had questioned the principals of both parties under oath, confirming the voluntariness of the settlement and their understanding and acceptance of its terms. In *Terrain Enterprises, Inc. v. Western Casualty and Surety Co.*, 774 F.2d 1320 (5th Cir.1985), *cert. denied*, 475 U.S. 1121, 106 S.Ct. 1639, 90 L.Ed.2d 184 (1986), the court simply decided, under the law of the state of Mississippi, that where there had been "a genuine misunderstanding" between an attorney and his client regarding the attorney's authority, the attorney nevertheless had had the apparent authority to bind his client to a settlement, something Rosenthal never purported to have here. *Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 417 N.Y.S.2d 218, 390 N.E.2d 1143 (1979), is wholly inapplicable to any of the issues herein. There, a town board passed a resolution accepting the proposal of the plaintiff to perform certain work for the town, and the resolution provided that the town supervisor was authorized to execute the contract on behalf of the town. The town supervisor never signed the contract because thereafter a lower bidder appeared. The court found the contract enforceable because the statutory law provided that once the town board adopted the resolution awarding the standard form contract to the plaintiff, "the same *shall* be executed by the supervisor in the name of the town," making the supervisor's signature non-discretionary and purely ministerial. 47 N.Y.2d at 149–50, 417 N.Y.S.2d at 220, 390 N.E.2d at 1145. *Smith v. Onyx Oil and Chemical Co.*, 218 F.2d 104 (3d Cir.1955), involved a negotiated contract sent by one party to

the other for signature with a letter advising that after the latter party had signed it, the former would send a fully executed one for the latter's files. The latter signed the contract, but the former repudiated it, and the court held that the contract had become effective upon the latter's signature.

The final case upon which defendants place heavy reliance where a settlement agreement was enforced is *International Telemeter Corp. v. Teleprompter Corp.*, 592 F.2d 49 (2d Cir.1979), but that case is also inapposite. There, the court, affirming the finding of the district court that the parties intended to be bound to the settlement agreement prior to formal delivery, found "particularly significant" the *"signing* and transmittal" of the stipulation and order of dismissal by the attorney for Teleprompter, the party seeking to disavow the settlement, to his adversary. 592 F.2d at 55 (emphasis added).[10] The court also agreed with the district court that "these two lawyers would not have *signed* the stipulation unless they understood that both parties intended to be bound at that juncture...." *Id.* (emphasis added). Moreover, the court placed great reliance on the fact that Teleprompter's attorney informed his adversary that Teleprompter had executed the settlement agreement and that although Teleprompter claimed to the court not to have fully executed it, it had received copies of its attorney's announcement to his adversary but had taken no steps to disavow the statement at the time. Here, of course, we had no execution of the agreement or stipulation of dismissal by Rosenthal or Stetson. Judge Friendly wrote a concurring opinion in *International Telemeter*, making the following apposite observation about what he believed the state of the relevant law to be in New York:

> "[W]hen the parties have manifested an intention that their relations should be embodied in an elaborate signed contract, clear and convincing proof is required to show that they meant to be bound before the contract is signed and delivered. Such a principle would accord with what I believe to be the intention of most such potential contractors; they view the signed written instrument that is in prospect as 'the contract', not as a memorialization of an oral agreement previously reached.

> \*   \*   \*   \*   \*   \*

> Upon the understanding that our decision rests on the unique facts here presented and that we are not entering a brave new world where lawyers can commit their clients simply by communicating boldly with each other, I concur in the judgment of affirmance."

592 F.2d at 58.

In sum, because herein there was no intent to be bound to any settlement prior to execution, the draft agreement cannot be enforced and defendants' motion should be denied.[11]

## MOTION FOR SUMMARY JUDGMENT

■ Prior to any of the events concerning the disputed settlement having arisen, defendant Duncan had filed a motion for summary judgment. (Diamond Productions, Inc. had not yet been joined as a defendant.) It was consideration of this motion that was continuously postponed when settlement was purportedly forthcoming, although it was apparent that the motion was meritless (see footnote 1, *supra*). It need not detain us long now.

10. Defendants here should not think that their disingenuous statement in their Memorandum, that the court found particularly significant the *"preparation* and forwarding" of the stipulation and order, has been lost on this court. (See Memorandum of Points & Authorities in Support of Defendants' Motion to Enforce Settlement Agreement at 11.)

11. Because of my conclusion that the motion must be denied for the reasons set forth hereinabove, I do not address plaintiff's other arguments against enforcement of the settlement, which are (a) that the agreement provides for an uncontrolled license and would result in an abandonment of the trademark, and (b) that the joint application for which the agreement provides is against public policy and would be rejected by the Patent and Trademark Office unless a fraud is perpetrated upon that office by the failure to disclose the terms of the agreement.

The motion is supported by three affidavits, one from Duncan, one from his attorney, Quirk, and one from an individual named Joseph Wood. According to these submissions, Stetson, who had formed a group using the name "The Diamonds" in the early 1970's, entered into an agreement in March 1979 with Wood and another individual named Glen Settle. Pursuant to this agreement (Exhibit A to the Wood affidavit), Wood and Settle were to advance certain monies to Stetson to assist in promoting "The Diamonds" and making records in return for a percentage of royalties from the sale of records and eventual repayment of the monies. According to Wood, by 1982 he and Settle had given substantial promotional assistance and substantial sums to Stetson, none of which had been repaid. Wood claims that Stetson, therefore, agreed to assign to them two-thirds of his interest in the rights to the mark "The Diamonds"—one-third to Wood and one-third to Settle. Wood says that Stetson had represented that he had taken the place of one of the members of the original group known as "The Diamonds" and had therefrom succeeded to rights in the name which were evidenced by a trademark registration issued to him in 1974. Wood relates, however, that when the time came to formalize the assignment to him and Settle, they learned that the registration had been allowed to lapse after six years and was cancelled by the U.S. Patent and Trademark Office, so the three agreed to reapply for registration as joint owners of the mark. He states that Stetson signed this joint application in the presence of him and his secretary. The Quirk affidavit attaches a copy of this application, containing signatures of Stetson, Wood and Settle, which Quirk states was filed in the U.S. Patent and Trademark Office on May 24, 1982. Duncan, claiming rights in the mark, filed an opposition to this registration. That opposition was settled in September 1984 by assignment by Wood and Settle's widow (administratrix of Settle's estate) of their two-thirds interest in the mark to Duncan's company, Diamond Productions, Inc. Based on the foregoing, defendants argue that if indeed plaintiff ever had any rights to the mark "The Diamonds," as two-thirds of his interest have been transferred to defendant Diamond Productions, Duncan is entitled to summary judgment herein.

In opposition to the motion Stetson acknowledges that he entered into an agreement with Wood and Settle to promote "The Diamonds" and that they advanced him $5,000, but that he never agreed to assign any interest in the mark to them and never executed any such assignment. He states, moreover, that he never executed any application to register the mark with Wood or Settle and that his purported signature on the application (annexed to the Quirk affidavit) is a "blatant forgery." The defendants have not filed any further papers in response to plaintiff's submission.

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party must satisfy an initial burden of demonstrating the absence of a genuine issue of material fact by pointing out that there is no evidence to support the nonmoving party's case or by supplying evidence that negates the nonmovant's claim. *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The nonmoving party then must meet a burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and if this burden is met summary judgment must be denied unless the moving party comes back with additional evidence sufficient to satisfy its ultimate burden of persuasion on the motion. The "court must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion," *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* — U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), and summary judgment must be denied unless the court determines that "the record as a whole could not lead a rational trier of fact to find for the non-

moving party," *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

It goes without saying that if plaintiff here assigned two-thirds of any rights he had in "The Diamonds" to Wood and Settle who thereafter assigned those rights to defendant Diamond Productions, defendants would be entitled to judgment. But Stetson has challenged the critical "fact" on which defendants' motion is based by stating that he never assigned his rights. It is true that while the defendants, through Joseph Wood, claim such an assignment occurred, they have not submitted any such written assignment, relying instead for documentation of such assignment solely upon a trademark application, purportedly executed by Stetson together with Wood and Settle, on which Stetson claims his signature has been forged.[12] Although Stetson submitted this affidavit in opposition to the motion over three years ago and although I pointed out to defendants' counsel the obvious deficiency of the motion back in December 1984 (see footnote 1, *supra*), defendants to this day have never come forward with any additional evidence to support their contention. Given the dispute over this critically material fact, the motion for summary judgment must be denied.

## CONCLUSION

Based on the foregoing I respectfully recommend that your Honor deny defendants' motions for enforcement of the settlement agreement and for summary judgment. If your Honor should agree with these recommendations, I will arrange a conference forthwith to schedule any remaining discovery and ready the case for trial.

Copies of this Report and Recommendation have been mailed this date to the following:

Stephen L. Baker, Esq.

Baker & Friedman
220 Fifth Avenue, Suite 1500
New York, New York 10001
Perla M. Kuhn, Esq.
Kuhn and Muller
1412 Broadway
New York, New York 10018
Barry Evans, Esq.
Curtis, Morris & Safford, P.C.
530 Fifth Avenue
New York, New York 10036
Edward J. Quirk, Esq.
Seiler, Quirk & Tratos
550 E. Charleston Boulevard, Ste. D
Las Vegas, Nevada 89104

The parties are hereby directed that if you have any objections to this Report and Recommendation you must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court and send copies to the Honorable John M. Walker, Jr., to the opposing party and to the undersigned. Failure to file objections within the specified time may waive your right to appeal from any order that will be entered by Judge Walker. See *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir.1983).

Dated: New York, New York

March 15, 1988

---

**12.** Under the Lanham Act, assignments of a trademark "shall be by instruments in writing duly executed." 15 U.S.C. § 1060 (1982). *See, e.g., DEP Corp. v. Interstate Cigar Co.*, 622 F.2d 621, 622–23 (2d Cir.1980). *But see Speed Products Co. v. Tinnerman Products*, 179 F.2d 778, 782 (2d Cir.1949) (writing not necessary to assign common-law trademark rights).